UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| FREE SPEECH FOUNDATION, INC. d/b/a AMERICA'S FRONTLINE DOCTORS, INC., an Arizona nonprofit corporation, and JOSEPH GILBERT, <br><br> Plaintiffs, <br><br> v. <br><br> SIMONE GOLD, <br><br> Defendant. | ) ) ) ) ) ) ) Case No. 22-CV-00714-SPC-NPM ) ) ) ) ) ) ) ) ) ) |

_____

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT SIMONE GOLD'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1) [ECF NO. 24]**

Defendant Gold's motion to dismiss should be denied because two significant facts, which she ignores, defeat her arguments. First, ***nine months before this lawsuit was filed***, Gold resigned from the Board of AFLDS, a nonprofit Section 501(c)(3) public charity, and resigned her position as AFLDS's executive director as well. She continued to represent herself as the founder and public voice of AFLDS, but as of February 3, 2022, she held no officer, director, or other official management role with AFLDS. Based on AFLDS's status as a nonprofit charity, it was legally run by its Board of Directors – which indisputably did not include

1

Defendant Gold. Gold resigned from the Board because *she* wanted to start (and did start) a new and separate for-profit business called GoldCare Marketing Services, LLC ("GoldCare LLC") designed to run to health and wellness centers.

Second, when Gold went to prison in July 2022, AFLDS underwent significant changes that further removed Gold operationally from the center of AFLDS. Such changes were consistent with official nonprofit leadership changes, and particularly in light of information that surfaced in and around that time period that Gold had apparently misused AFLDS's charitable resources. AFLDS undertook investigatory measures, including forensic accounting activities, which are still ongoing, in order to guard the organization's assets. As the months continued, the AFLDS Board further learned of Gold's misconduct and excessive financial benefits that she had reaped while previously in legitimate leadership. Whether in retaliation, to insulate herself from further scrutiny, or in an effort to regain her prior leadership, Gold attempted to retake operational control of AFLDS starting in October 2022.

These facts are critical to resolving Gold's motion to dismiss because by the time this lawsuit was filed in November 2022, Gold had long been out of any official leadership role with AFLDS. As set forth more fully below, the employees Gold identifies in her Motion are primarily working for her own entity GoldCare or her personally, or no longer live in Florida. Consequently, her residential location in

Florida was no longer (if it ever was) the operational "nerve center" for AFLDS' operations, as germane to the question of diversity jurisdiction.

In light of the foregoing facts, and those set forth below and alleged in the Complaint, jurisdiction is appropriate in this Court. There is complete diversity and Plaintiffs have alleged sufficient facts to meet the $75,000 jurisdictional requirement. Accordingly, Defendant's motion should be denied.

## FACTUAL BACKGROUND

Simone Gold incorporated ALFDS in June 2020 under the Arizona Nonprofit Corporation Act. From September 2020 through January 2022, Gold was one of the nonprofit board's directors and the executive director of AFLDS. In her role as executive director, Gold exerted substantial influence over the organization, authorized the hiring of employees, setting compensation, including her own, and overseeing a wide range of operational functions. Despite Gold's substantial influence within AFLDS, the organization is and always has been governed by a Board of Directors – as legally proper for this nonprofit public charity. (AFLDS Bylaws, Article III and IV, Ex. A hereto)

In the fall of 2021, based on Gold's suggestion, AFLDS executives agreed it might be a good idea to have AFLDS headquartered in Florida. (Joseph Gilbert Declaration at ¶ 4, Ex. B hereto) Gold began shopping for homes in Florida. Mr. Gilbert was aware that Gold was looking to purchase a home in Florida, but Gold

never obtained approval from the Board to use AFLDS charitable funds to do so. (Id.)

Nevertheless, on November 21, 2021, without a Board vote or approval, Gold entered into a Sales Contract for a residential property with Seagate Charm LLC, agreeing to purchase the house located at 808 Myrtle Terrace in Naples Florida for $3.6 million (the "Naples Home"). (Sales Contract at ¶ 1, Ex. C hereto). Shortly thereafter, again without a Board vote or approval, Gold formed a limited liability company called Naples Freedom Headquarters LLC with AFLDS as the sole member and her as the manager.[1] (Naples Freedom Headquarters LLC Operating Agreement, Ex. D hereto) Thereafter, without Board approval, she had the title of the home placed in the name of that LLC. In connection with that purchase, Gold agreed to put down $50,000 as an initial deposit and an additional $250,000 fifteen days later. (Ex. C, Sales Contract at ¶ 1) Gold used AFLDS money to make these payments. (Ex. B, Gilbert Decl. at ¶ 5)[2] Gold also entered into a lease to rent another home in Florida for $15,000 per month (the "Rental Home"). The Naples Home is

---

[1] Defendant intimates that Plaintiffs have asserted frivolous litigation because they did not plead in their Complaint that AFLDS is the sole member of Naples Freedom Headquarters, LLC. (ECF No. 24 ("Mot.") at n. 4) Plaintiffs continue to believe that this information is not relevant to their claims given Gold's actions to form it and identify AFLDS without board approval as the member of the LLC. But even if it is relevant to their claims, omitting such fact certainly does not render the case frivolous or wrongly motivated.

[2] Defendant Gold has cut the Board off from access to AFLDS' financial information, and AFLDS looks forward to submitting such information once discovery has been conducted and the organization regains access to its own records.

Gold's personal residence. The Rental Home is the place where Gold wanted to hold team meetings, or what others have referred to as the "Team House." (Id.)

Gold failed to get board approval for any of these actions, but she later communicated with the Board to justify her purchase and to explain how the homes could be used for both organizational and personal purposes. The Board and its counsel had repeatedly advised Gold not to purchase a residential home, but Gold did it anyway and even used AFLDS funds.[3] The Board did not become aware that Gold had used AFLDS funds to purchase the Naples Home – her personal residence -- until after she had already closed on the home. (Id.) And the Board was not provided with a listing contract or purchase offer or invoice, or a lease or lease paperwork until after Gold had taken these actions. To this day, Gold lives in the Naples Home rent free and AFLDS funds are used each month to pay the rent at the Rental House.

On February 2, 2022, at an AFLDS Board of Directors meeting held via Zoom (and not in Florida), Gold resigned as the Chief Executive Officer and as a Board member. (Board Minutes, Ex. E hereto; 11/8/22 Landau Aff. at 1, Ex. F hereto) Gold

---

[3] Defendant calls Plaintiffs' allegations "stunningly false" because the Board of Directors knew that the sole owner of the Naples House was AFLDS. (Mot. at n.5) Plaintiffs do not dispute that the Board eventually knew that the sole owner was AFLDS. Indeed, Plaintiffs' allegations are that the Board did not approve or know that Gold was using AFLDS funds to purchase the homes in Naples. Gold had the influence and audacity to sign a contract on a multi-million-dollar house using AFLDS funds, to direct AFLDS counsel to create an LLC, and to singlehandedly put the deed to the house in that LLC's name.

5

thereafter ceased to be a director of AFLDS and held no official leadership capacity over AFLDS. Amy Landau, a resident of Texas, was appointed Executive Director and Mr. Gilbert, a resident of Nevada, was appointed Chairman of the Board. (Board Minutes, Ex. E; Declaration of Amy Landau Decl. at 1, attached as Exhibit G hereto; Ex. B, Gilbert Decl. at ¶ 1)

At the same February 2, 2022 Board meeting, it was suggested that Gold and ALFDS enter into an independent contractor consulting agreement so that Gold could continue to raise money for AFLDS. The Board voted to have Mr. Gilbert negotiate the consulting agreement with Gold. (Board Minutes, Ex. E). During the negotiations of the consulting agreement, Gold sought from AFLDS a "signing bonus" of $1.5 million and $50,000 monthly as a consulting fee. Under that agreement, Gold's new LLC, which she formed and of which on information and belief she is the sole member, was also to be granted, at no cost, private work space and accommodations at the Naples Home. (Agreement for Consulting Services, Ex. H hereto) Such arrangement became the subject of scrutiny by the forensic auditors in light of Gold's apparent intended *for-profit* usage of a *nonprofit asset,* which raises significant IRS-related issues that the AFLDS Board has been diligently addressing. The consulting agreement was never signed. Thereafter, the nature of Gold's marketing role on behalf of AFLDS was unclear; but she was unquestionably

*not* a director of the Board or otherwise in any official management capacity for AFLDS.

In or about June 2022, the ALFDS Board received legal counsel regarding potential excess benefit transactions involving Defendant Gold, and particularly under Section 4958 of the Internal Revenue Code ("intermediate sanctions"). This counsel confirmed significant concerns the Board had in April and May of 2022 that Gold was using AFLDS to forward her for-profit business and pay for her personal expenses. (Ex. B, Gilbert Decl. at ¶ 6) The AFLDS Board initiated an executive compensation study to address both the proposed payments to Gold under the consulting agreement as well as other emerging information about her financial benefits, including her use of the Naples Home for personal and for-profit business activities. AFLDS hired Capin Crouse LLP, and accounting firm with expertise in the nonprofit sector, to complete the study on or around July 18, 2022. (Ex. B, Gilbert Decl. at ¶ 7) The AFLDS Board also commenced a forensic audit regarding Gold's apparent misuse of AFLDS funds, all to comply with applicable IRS requirements and to identify any appropriate remedial measures. (Id.)

On July 26, 2022, Gold reported to serve a 60-day sentence in federal prison, related to her involvement in the January 6, 2022 attack on the U.S. Capitol. While Gold was in prison, the AFLDS Board of Directors and staff ran the organization,

7

not Gold. Plaintiff Gilbert, the Board Chairman and Director of Strategy, led AFLDS's day-to-day operations. (Ex. B, Gilbert Decl. at ¶ 8)

Gold was released from prison on September 9, 2022 and continues to be under supervised release. Upon Gold's release, Mr. Gilbert, as Chairman of the AFLDS Board, advised Gold of the steps the Board had taken in her absence to investigate her apparent improper use of charitable funds for personal purposes and the corrective steps it would need to take as a result. In his communications to Gold about the corrective steps, Gilbert advised Gold of the need to sell the Naples House, her personal residence. (Ex. B, Gilbert Decl. at ¶ 9) Within a few weeks thereafter, and before the Board could proceed with listing the house for sale, Gold started her personal takeover of AFLDS's operations.

This chronology is quite significant because even though Gold was at the center of ALFDS operations for much of AFLDS' existence, that has not been the case since at least *July 2022*. By her own admission, she has not been a director or officer since February 2022, although she now claims such status.[4] Indeed, Gold wrote to AFLDS' in-house counsel stating in no uncertain terms that the pre-

---

[4] For example, Gold claims in Paragraph 28 of her affidavit that she is "President" of AFLDS. But she provides no support for such bald assertion, and it is clearly contrary to the uncontroverted evidence showing that she resigned in February 2022 and was never put back into office by the AFLDS Board. She likewise asserts that other AFLDS employees work from Florida, but at least some of the people she mentions are no longer AFLDS employees. She further asserts in Paragraph 29 of her affidavit that "there is no other single place where AFLDS workers meet and congregate." That is simply untrue, given AFLDS's operations throughout the country. See Gold Affidavit, attached to her Motion to Dismiss as Exhibit 1.

sentencing report identifying her as Chairman of AFLDS was wrong and that she had "not been on the Board for many months." (May 22, 2022 Email attached as Ex. I hereto). Further, AFLDS' governing Bylaws provide that (1) a resignation of a Board member is effective when tendered; and (2) Board members must be elected to office. (Ex. A, Bylaws at Article VII and IV) Gold's assertion that she is the Chairman of the Board is untrue and not supported by the AFLDS Bylaws.

Gold's attempts to seize operational control away from the legitimate AFLDS Board (and to continually disparage its leader Plaintiff Gilbert) constitutes the very reason AFLDS instituted the pending litigation. Gold cannot use her illegitimately seized power over AFLDS' operations in order to defeat diversity jurisdiction. Simply put, she is not the "nerve center" of AFLDS – except possibly by her own dint of illegally exercised force.

AFLDS' operations and decision-making do not legally rest with Gold (although she clearly wishes it were so). Additionally, the Naples House in Florida is used primarily as Gold's residence and the Rental House for meetings of *GoldCare* employees, not for AFLDS business. Further, the Rental House was used for AFLDS business prior to March 2022, for a goodbye party for Gold when was on her way into prison, and for key executives to meet with Gold before she went to prison to get content and footage for AFLDS advocacy when she was in prison. (Ex. B, Gilbert Decl. at ¶ 10)

Many of the "employees" Defendant identifies in her brief as supporting the notion that AFLDS is based in Florida live there because they work for Gold or GoldCare. Defendant identifies the Bradfords as living in Florida, but they moved and now live in South Carolina. (Declaration of Lauren Bradford Decl. at ¶ 4, attached as Exhibit J hereto) Defendant identifies her boyfriend, John Strand, who lives with her in her personal residence, the Naples House, and no longer works for AFLDS. She further identifies the Andrzejewski couple, but (a) Lisa is her personal assistant and works for GoldCare and (b) A.J. is her personal security guard and also works for GoldCare. Further, the Andrzejewskis live in Georgia. (Ex. B, Gilbert Decl. at ¶ 16) None of the individuals Gold mentions are legitimate decisionmakers within AFLDS – not her, and not the others she has identified.

## ARGUMENT

### I. At The Time This Lawsuit Was Filed, Florida Was Not AFLDS' "Nerve Center."

It is axiomatic that "[t]he jurisdiction of the Court depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-71 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 9 Wheat. 537, 539, 6 L. Ed. 154 (1824)). "This time-of-filing rule….measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing--whether the challenge be

brought shortly after filing, after the trial, or even for the first time on appeal." *Id*. (citing *Capron v. Van Noorden*, 6 U.S. 126, 2 *Cranch* 126, 2 L. Ed. 229 (1804)).

A court need not determine "where a corporation's principal place of business is located, rather, it is only necessary to determine whether or not it is located in the forum state." *Chusid v. Swire Pac. Holdings, Inc*., 2010 U.S. Dist. LEXIS 148297, *10 (S.D. Fla. July 16, 2010). A corporation's principal place of business, for diversity jurisdiction purposes, is its "nerve center." *TFG Life Settlements, LLC v. Centurion ISG (Eur.) Ltd*., 2016 U.S. Dist. LEXIS 47783 at *5 (M.D. Fla. April 8, 2016) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 81, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010)). "The 'nerve center' test considers factors such as: mailing address, location of records, corporate directors, annual meetings, corporate assets, corporate bank accounts, where payments to creditors originate, where the corporation's bills are sent and where its policies are set." *Chusid*, 2010 U.S. Dist. LEXIS 148297 at 12 (citing *Sweet Pea Marine, Ltd. v. APJ Marine, Inc*., 411 F.3d 1242, 1248 (11th Cir. 2005)).

Plaintiffs have pled that AFLDS' principal place of business is Arizona. Defendant argues that AFLDS' principal place of business is in Florida because AFLDS owns property there, had its headquarters established there, and meetings

were held in the so-called "Team House" through April 2022. (Mot. at 7-8)[5] It is accurate that *Gold* – without approval of the Board – bought property in Florida and put it in AFLDS' name. It is accurate that *Gold* hosted several meetings in the Rental House even though the Board never voted to establish AFLDS' headquarters in Florida. It is notable that Gold's motion to dismiss provides no AFLDS board resolutions, no AFLDS board minutes, no other AFLDS documentation that AFLDS' Board actually approved of her actions or that AFLDS has operated from a Florida location. At the time of this litigation was initiated, AFLDS had not operated in Florida for at least six months. The reality is that the Rental House was used for AFLDS business prior to March 2022, for a goodbye party for Gold when was on her way into prison, and for key executives to meet with Gold before she went to prison to get content and footage for AFLDS advocacy when she was in prison. (Ex. B, Gilbert Decl. at ¶ 10) The Naples House is not a team house; it is Gold's personal residence. – and a location for Gold's personal business: Gold Care, LLC.

As of the date the lawsuit was filed:

- None of the AFLDS directors lives in Florida – Mr. Gilbert resides in Nevada; Mr. Mack resides in Arizona; and Mr. Matthesius resides in California. (Ex. B, Gilbert Decl. at ¶ 17);

---

[5] The affidavits Plaintiffs submitted in support of their Motion for Temporary Restraining Order refer to the Team House, as Defendant notes. But the meetings referenced all happened when Gold was still exercising influence over the day-to-day activities of AFLDS.

- AFLDS' bank accounts are held in Tennessee, California, and Nevada (Id. at ¶ 11);

- AFLDS' accountant and head of payroll, Troy Brewer, lives in Tennessee (Ex. J, Bradford Decl. at ¶ 6);

- AFLDS' in-house counsel, Lauren Bradford, lives in South Carolina (Id. at ¶ 4);

- AFLDS' information technology director, Drew Kucharak lives in Nevada (Ex. B, Gilbert Decl. at ¶ 12);

- AFLDS' Director of Social Media, Mike Coudrey, lives in Africa (Id. at ¶ 13);

- AFLDS' news team lives in Israel (Id. at ¶ 14); and

- Decisions of the board are made virtually and in no particular state (Id. at ¶ 15).

Many of the individuals Defendant identifies in her brief as supporting the notion that AFLDS is based in Florida live there because they work for Gold or GoldCare. Defendant identifies the Bradfords as living in Florida, but they moved and now live in South Carolina. (Ex. J, Bradford Decl. at ¶ 4) Defendant identifies her boyfriend, John Strand, who lives with her in the Naples House, and no longer works for AFLDS. She further identifies the Andrzejewski couple, but (a) Lisa is her personal assistant and works for GoldCare and (b) A.J. is her personal security guard and also works for GoldCare. Further, the Andrzejewskis live in Georgia. (Ex. B, Gilbert Decl. at ¶ 16) None of the individuals Gold mentions are legitimate decision-makers within AFLDS – not her, and not the others she has identified.

13

Florida is not AFLDS' nerve center. That is particularly and acutely so, since Gold is not a director, officer, or manager of AFLDS – and she has not been since February 2022. If anything, there is no physical principal place of business given that its employees are all over the country and the world, decisions are made in virtual spaces by directors that live in California, Arizona, and Nevada, bank accounts are in several different states, AFLDS' social media is posted from Africa, their news is written from Israel, and AFLDS' advocacy occurs all over the United States through speaking engagements and media outlets. Defendant's motion to dismiss should be denied.

## II. Plaintiffs Have Adequately Alleged Damages to Meet the Jurisdictional Requirement.

"In order to establish that a court has jurisdiction on diversity grounds, the plaintiff must affirmatively allege facts in the complaint indicating that the amount in controversy exceeds $75,000, exclusive of interest and costs…" *Primm v. Shell Oil Co*., 2011 U.S. Dist. LEXIS 165988, *5 (M.D. Fla. Mar. 2, 2011) (citing *Massey v. Cong. Life Ins. Co*., 116 F.3d 1414, 1418 n.1 (11th Cir. 1997)). When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith. *See, e.g., Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U. S. 274, 276, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) ("'[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith.'" (quoting *St. Paul*

*Mercury Indemnity Co. v. Red Cab Co.*, 303 U. S. 283, 288, 58 S. Ct. 586, 82 L. Ed. 845 (1938); alteration in original)).

Defendant claims Plaintiffs have not adequately alleged damages to meet the jurisdictional requirement of $75,000. To the contrary, Plaintiffs have affirmatively alleged facts in the Complaint indicating that the amount in controversy exceeds $75,000 as follows:

- Gold purchased a $3.6 million home using AFLDS funds (Cmplt. at ¶ 12);

- Gold signed a lease and paid a $45,000 advance and $15,000 per month using AFLDS funds (Id. at ¶ 14);

- Gold purchase three vehicles for her personal use including a Mercedes Benz Sprinter Van, a Hyundai Genesis, and a GMC Yukon Denali using AFLDS funds (Id. at ¶ 15);

- Gold paid a personal security officer $12,000 a month and a personal housekeeper $5,600 per month using AFLDS funds (Id. at ¶ 16);

- Gold bought personal items on her AFLDS credit card at a rate of $50,000 per month (Id.);

- Gold flew on a private plane using AFLDS funds without approval from the Board, costing AFLDS over $100,000 for one trip (Id. at ¶ 18);

- Gold diverted AFLDS employees to work for her own company, GoldCare, allowing AFLDS to pay their salaries (Id. at ¶ 22).

The Complaint not only sufficiently alleges facts demonstrating damages in excess of $75,000, but also, this Court must accept those allegations at this stage

absent a finding of bad faith. There is none here and Defendant's motion should be denied.

## CONCLUSION

Plaintiffs have met the requirements for subject-matter jurisdiction based on diversity of citizenship and have adequately pled facts demonstrating that their damages exceed $75,000. Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss [ECF No. 24].

**[SIGNATURE ON FOLLOWING PAGE]**

November 23, 2022                              Respectfully submitted,

/s/ *Joshua D. Lerner*
Joshua D. Lerner
Florida Bar No. 455067
E-mail: jlerner@rumberger.com,
docketingmiami@rumberger.com,
and jlernersecy@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
Brickell City Tower, Suite 3000
80 S.W. 8th Street
Miami, Florida 33130
Telephone: (305) 358-5577
Telecopier: (305) 371-7580

Samantha D. Duke
Florida Bar No. 091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
Telephone: (407) 872-7300
Telecopier: (407) 841-2133

Sally Wagenmaker, Esq.
Kellye Fabian Story
WAGENMAKER & OBERLY
53 West Jackson Blvd., Suite 1734
Chicago, Illinois 60605
Email: kellye@wagenmakerlaw.com
Telephone: (312) 626-1600
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

17356733.v1