EXHIBIT C

EXHIBIT C




# SALES CONTRACT (RESIDENTIAL IMPROVED PROPERTY)

**SELLER:** *Seagate Charm LLC*      **BUYER:** *Simone Gold*
**SELLER:**      **BUYER:**
**ADDRESS:**      **ADDRESS:**

1  UPON ACCEPTANCE OF THE OFFER OR COUNTEROFFER, SELLER has agreed to sell and BUYER has agreed to buy, UPON THE
2  FOLLOWING TERMS AND CONDITIONS, the real property hereafter legally described, including the lawn, trees, shrubbery and landscaping
3  (collectively "the Landscaping") and all non-leased fixtures (the "Real Property") together with the following items existing on the Real Property
4  on the Effective Date: built-in appliances and beverage cooler(s)/dispenser(s); attached lighting; ceiling fan(s); built-in shelving/closet fittings;
5  wall-to-wall carpeting; integrated home automation, audio-visual, home entertainment and/or home sound systems including all operational
6  components and software; hurricane/storm shutters and panels and all components; central vacuum system including hoses; intercom system;
7  water softener/purification system; built-in home generator; security/surveillance system including cameras; drapery rods; television brackets
8  (excluding televisions); decorative shutters; and pool equipment; and _____
9  _____
10 (the Real Property and the above items are collectively referred to as the "Property"), and together with the following personal property existing
11 on the Real Property on the Effective Date: refrigerator(s); range(s); dishwasher(s); microwave(s); washer(s); dryer(s); draperies, curtains, blinds,
12 shades and other window treatments; garage door opener(s)/remote(s); keys, fobs and other access devices (including to community property);
13 pool or solar cover; child pool safety fence, and automated pool cleaning equipment, and _____
14 _____,
15 and the additional personal property, if any listed on the attached inventory or list (the "Personal Property").
16 The following items are excluded: _____.
17 The Personal Property shall be free from liens and is deemed without value, left for the convenience of the parties, and transferred without
18 consideration, unless otherwise agreed to by the parties.
19 The address of the Property is: **808 Myrtle Ter Fl 34103, Naples, FL  34103-2821**
20 **LEGAL DESCRIPTION OF THE PROPERTY:**
21 **MYRTLE TERRACE BLK B LOT 12 + E 25FT OF LOT 13 OR 1031 PG 1991**, **Collier** County, Florida.
22 IF THE PROPERTY IS A COOPERATIVE PARCEL, THE "ADDENDUM TO SALES CONTRACT COOPERATIVE" IS INCORPORATED
23 HEREIN AND MADE AN INTEGRAL PART OF THIS CONTRACT.
24 If applicable, SELLER shall convey SELLER's exclusive right to use the following: Parking Space(s) # _____,
25 Garage(s) # _____, Cabana(s) # _____, Storage Locker(s) # _____, Boat Dock(s) or Slip(s) # _____, and other
26 common elements and common areas to which SELLER has an exclusive right of use and the right to convey. [SG] 11/16/2021  SK
27 1. **PURCHASE PRICE:** The purchase price (U.S. currency), which is allocated to the Property  ~~$3,600,000.00~~
28    only unless otherwise stated, shall be payable as follows: ........................................... $ ~~3,450,000.00~~ 3,650,000.00 SK
29    A. Initial Deposit to be held in escrow ........................................................... $ 50,000.00
30       [SELECT ONE. IF NO SELECTION IS MADE, ACCOMPANIES OFFER SHALL APPLY.]
31       ☐ accompanies offer ☐ is due on the Effective Date ☒ is due not later than **2** days after the Effective Date.
32       Additional Deposit to be received in escrow not later than **15** days after the
33       Effective Date ................................................................................................. $ 250,000.00
34    B. Proceeds of mortgage, if any [See Paragraph 4.B.] ................................. $ _____
35    C. Proceeds of SELLER mortgage, if any [see Paragraph 4.C.] .................. $ _____ [SG] 11/16/2021
36    D. Other: _____ $ _____
37    E. Balance of the purchase price, payable from BUYER to the closing agent  $3,300,000.00  SK
38       at closing, subject to adjustments and prorations, of approximately ........ $ ~~3,150,000.00~~ 3,350,000.00 SK
39 Closing funds and all deposit funds tendered to the closing agent within 15 days prior to closing shall be paid by wire transfer. All international funds
40 shall be paid by wire transfer. All deposits are subject to collection.

© 2021 Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. All Rights Reserved. (NABOR 1/1/2021x)
Approved by the Marco Island Area Association of REALTORS®, Inc. and the Collier County Bar Association. **Page 1 of 12**

John R Wood Properties, 787 5th Ave S Naples FL 34102    Phone: 2394340101    Fax:    808 Myrtle Ter Fl
Blaze Zdravev    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

SK

Authentisign ID: 4CE42922-F190-4124-B5F1-76A525DFE786

[SG] [initials] November 16th, 2021 [SR] [SG]

41  2. **PERIOD OF OFFER AND COUNTEROFFER; EFFECTIVE DATE:** This offer is revoked if not accepted and the signed offer delivered to
42  offeror, by 5 PM ~~11~~ ☒ AM ☐ PM on ___November 15, 2021___ {Insert Date}. Any counteroffer is revoked if not accepted and
43  the signed counteroffer delivered to counter offeror not later than _____ days [2 days if left blank] after delivery of the counteroffer.

44  The Effective Date of this Contract shall be the last date either SELLER or BUYER signs or initials this Contract. ALL CHANGES TO THE OFFER
45  OR COUNTEROFFER MUST BE INITIALED AND DATED. THE LATEST DATE SET FORTH ON THIS CONTRACT BY EITHER PARTY'S
46  SIGNATURE OR INITIALS SHALL BE THE EFFECTIVE DATE.

47  3. **CLOSING DATE; TIME OF THE ESSENCE; CLOSING LOCATION; CLOSING AGENT; POSSESSION:** Closing shall occur on
48  ___January 4, 2022___ {Insert Date} (the "Closing Date"). **Time is of the essence as to the Closing Date.** Closing
49  shall occur in the county where the Property is located, at an office designated by the closing agent, who shall be selected by BUYER. BUYER
50  shall be the legal owner of the Property as of the closing, and SELLER shall vacate and give possession of the Property at the closing. SELLER
51  shall leave the dwelling(s) on the Property in broom-clean condition and the entire Property free of debris.

52  4. **METHOD OF PAYMENT [SELECT ONE. IF NO SELECTION IS MADE, A. SHALL APPLY]:** ☒ **A. CASH/FINANCING WITHOUT
53  CONTINGENCY:** BUYER will pay cash, but may obtain a loan for the purchase of the Property; however there is no financing contingency. **If BUYER
54  elects to finance BUYER's purchase of the Property through a creditor/lender, BUYER shall be required to timely perform all BUYER's
55  obligations under the Contract and to close on the Closing Date, notwithstanding any terms and conditions imposed by BUYER's
56  creditor/lender and/or any applicable disclosure, delivery and compliance requirements of the Consumer Financial Protection Bureau
57  Integrated Mortgage Disclosure Rule ("CFPB Rule");** ☐ **B. FINANCING CONTINGENCY:** Subject to the provisions of this paragraph, BUYER's
58  obligation to purchase the Property is contingent upon BUYER obtaining a loan, unless waived by BUYER as set forth below, in the amount shown
59  in 1.B. above, to be secured by a mortgage on the Property at **[IF NO SELECTIONS ARE MADE, (1) SHALL APPLY]:** ☐ (1) Conventional
60  ☐ (2) VA ☐ (3) FHA ☐ (4) Other _____ . **[If VA OR FHA, The "Addendum to Sales Contract VA/FHA
61  Financing" should be attached hereto and made a part hereof]**, at ☐ (1) an initial or ☐ (2) fixed rate of interest not exceeding _____ %
62  per year, for an amortized term of _____ years [30 years if left blank]. BUYER shall make loan application as defined in the CFPB Rule ("Loan
63  Application") not later than _____ days after the Effective Date [5 days if left blank], and shall make a continuing good faith and diligent effort
64  to obtain said loan and comply with all applicable requirements of the creditor/lender and CFPB Rule relating to the loan process. If BUYER fails
65  to waive this financing contingency on or before _____ {Insert Date} [45 days after the Effective
66  Date if left blank], either SELLER or BUYER may terminate this Contract at any time. BUYER's termination under this contingency must be
67  accompanied by either (i) an Equal Credit Opportunity Act statement of adverse credit action issued by a creditor/lender confirming that mortgage
68  financing on the terms set forth in this Contract was denied on grounds that either the Property was unacceptable to the creditor/lender or the
69  BUYER financially failed to qualify for said financing terms, or (ii) other evidence from the creditor/lender that BUYER has made Loan Application
70  and made diligent and good faith efforts to meet all applicable requirements of the creditor/lender and the CFPB Rule, but has received neither
71  loan approval nor loan denial from the creditor/lender. SELLER's right to terminate shall cease to exist if BUYER waives this financing contingency
72  prior to SELLER giving BUYER notice of termination. **IF BUYER WAIVES THIS CONTINGENCY AND IS UNABLE TO CLOSE ON THE
73  CLOSING DATE DUE TO A DELAY CAUSED SOLELY BY THE CREDITOR/LENDER AND/OR NECESSITATED BY THE CFPB RULE,
74  BUYER MAY EXTEND THE CLOSING DATE UP TO 10 DAYS FOR CFPB RULE COMPLIANCE AND TO ACCOMMODATE RECEIPT AND
75  EXECUTION OF THE LOAN PACKAGE AND LOAN FUNDING.** Delivery of documentation evidencing loan commitment or loan approval
76  shall not constitute a waiver of the financing contingency. BUYER acknowledges that once BUYER waives this financing contingency,
77  BUYER's deposit monies are no longer refundable under this Paragraph 4. ☐ **C. SELLER FINANCING.** The "Addendum to Sales Contract
78  Seller Financing" is attached hereto and made a part hereof.

79  5. **CDD/MSTU SPECIAL TAX DISTRICTS:** The Property ☐ is ☒ is not located within a Community Development District ("CDD") or Municipal
80  Service or Benefit Taxing Unit ("MSTU"). BUYER will at closing assume any outstanding capital assessment balance. **If the Property is located
81  within a CDD or MSTU, and if there is any outstanding capital balance, BUYER should not execute this Contract until BUYER has
82  received and signed the "CDD/MSTU Assessments Disclosure" or similar written disclosure from SELLER setting forth the
83  approximate outstanding capital assessment balance, which BUYER will assume at closing.**



84  **6. CONDOMINIUM/HOMEOWNERS' ASSOCIATION AND GOVERNMENTALLY IMPOSED LIENS AND SPECIAL ASSESSMENTS:**
85  SELLER shall pay the full amount of condominium/homeowners' association special assessments and governmentally imposed liens or special
86  assessments (other than CDD/MSTU assessments which are addressed in Paragraph 5), which, on or before the Effective Date, are a lien or a
87  special assessment that is certain as to (a) the identity of the lienor or assessor, and (b) the property subject to the lien or special assessment,
88  and (c) the amount of the lien or special assessment. If, as of the Effective Date, there are any pending liens or special assessments (liens or
89  special assessments other than those described above) which are not SELLER's obligation as set forth above and which were not disclosed in
90  writing to BUYER by SELLER prior to or concurrent with the execution of this Contract, and which exceed 1% of the purchase price, BUYER
91  may terminate this Contract, unless SELLER agrees in writing to pay the portion of such pending liens or special assessments in excess of 1%
92  of the purchase price, and SELLER agrees to pay into escrow at closing a reasonable sum to insure that the excess will be paid.

93  **7. EXISTING LEASES WITH POST-CLOSING OCCUPANCY.** ☐ If this box is checked, the Property is subject to one or more leases and/or
94  rental agreements (collectively "Leases") in effect as of the Effective Date with occupancy occurring after the closing. SELLER shall deliver
95  complete information regarding the terms of said Leases and copies of all written Leases (collectively the "Lease Information") to BUYER not
96  later than 5 days after the Effective Date. BUYER shall have 5 days after receipt of the Lease Information to review the same, and may terminate
97  this Contract not later than 5 days after receipt of the Lease Information if, in BUYER's sole discretion, the Lease Information is unacceptable. If
98  SELLER fails to timely deliver the Lease Information, BUYER may terminate this Contract not later than 10 days after the Effective Date.

99  **8. INSPECTIONS; WAIVER [SELECT ONE. IF NO SELECTION IS MADE, A. SHALL APPLY]:** ☒ **A. INSPECTIONS:** BUYER reserves the
100  right to conduct the inspections provided for in Standard D.2.a. and the rights and remedies provided for in Standard D.2.b. shall apply; OR
101  ☐ **B. DUE DILIGENCE/INSPECTIONS:** BUYER reserves the right to conduct the inspections provided for in the attached "Addendum
102  to Sales Contract "As Is" Sale of Property/Due Diligence," OR ☐ **C. WAIVER:** BUYER waives all inspection rights and remedies and accepts
103  the Property in its "as is" condition on the Effective Date, including the conditions disclosed in Standard D.1. and/or in Other Terms and
104  Conditions; however, BUYER retains the walk-through inspection rights set forth in Standard D.2.d (2), (3), and (4) and SELLER's obligation to
105  maintain the Property and Personal Property in accordance with Standard D.2.c. remains in effect.

106  **REAL ESTATE TRANSACTION STANDARDS**
107  THE REAL ESTATE TRANSACTION STANDARDS SHOULD NOT BE REVISED OR MODIFIED EXCEPT IN OTHER TERMS AND
108  CONDITIONS AND/OR *BY* ADDENDUM/ADDENDA.

109  **STANDARD A—TITLE; TITLING INSTRUCTIONS; ASSIGNMENT; TAX DEFERRED EXCHANGE.**
110  **1. MARKETABLE TITLE:** Title to the Property shall be good and marketable according to the Uniform Title Standards promulgated by the
111  Florida Bar, and have legal access, subject only to the following exceptions: (a) ad valorem and non-ad valorem real property taxes for the year
112  of closing and subsequent years; (b) zoning, building code and other use restrictions imposed by governmental authority; (c) outstanding oil, gas
113  and mineral interests of record, if any; and (d) restrictions, reservations and easements common to the subdivision (or condominium, if
114  applicable), provided that none of the foregoing shall prevent use of the Property for residential purposes.

115  **2. TITLING INSTRUCTIONS FROM BUYER; ASSIGNMENT:** Not later than 15 days prior to the Closing Date, BUYER shall deliver to SELLER
116  the name(s), address, manner in which title will be taken, and a copy of any assignment executed by BUYER. No assignment shall release
117  BUYER from the obligations of this Contract unless SELLER consents in writing to such release.

118  **3. TAX DEFERRED EXCHANGE:** If either party intends to treat this transaction as a tax-deferred exchange under I.R.C. Section 1031, the
119  other party shall cooperate in accomplishing the exchange, and consents to the assignment of this Contract to a qualified exchange intermediary
120  for that purpose, provided there is no additional cost or delay in closing and the exchanger is not released from liability under this Contract.

121  **STANDARD B—TITLE EVIDENCE; EXAMINATION; DEFECTS; LEGAL ACCESS; CLEARANCE.** Not later than 10 days after the Effective
122  Date, SELLER shall furnish to BUYER a complete copy of SELLER's owner's title insurance policy. If the Property is located in Collier County
123  and SELLER fails to furnish a copy of the policy within the above time period, SELLER shall give BUYER a $150.00 credit at closing in lieu
124  thereof. BUYER shall have 30 days after the Effective Date ("Examination Period") for examination of title and determination of legal access.
125  BUYER's obligation to purchase is conditioned on the Property having legal access to and from a public right of way sufficient for residential use.
126  If title is found defective or legal access is found to be lacking, BUYER shall, within the Examination Period, notify SELLER specifying the title
127  defect(s) or lack of legal access, and furnish copies of the title evidence and instruments evidencing such title defect(s) or lack of legal access.
128  If the title defect(s) render(s) title unmarketable, or if SELLER cannot deliver possession, or if there is no legal access, SELLER shall have 30
129  days after receipt of said notice and copies from BUYER (the "Clearance Period") to clear or remove such title defect(s), deliver possession,
130  and/or provide legal access, at SELLER's expense. SELLER will use diligent effort to correct the title defect(s), deliver possession, and/or provide
131  legal access within the Clearance Period, including the bringing of necessary suits. If the Closing Date is prior to the expiration of the Clearance

Authentisign ID: 4CE42922-F190-4124-B5F1-76A525DFE786
Authentisign ID: 992127A0-9BC9-4A16-8489-42627E20FE2F

132  Period, then the Closing Date shall be extended until the earlier of (i) 5 days after SELLER corrects the title defect(s), delivers possession, and/or
133  provides legal access or (ii) 5 days after the expiration of the Clearance Period. SELLER shall not be liable to BUYER for damages if SELLER
134  cannot render title marketable, deliver possession and/or provide legal access. If SELLER does not clear or remove the title defect(s), deliver
135  possession or provide legal access within the Clearance Period, BUYER may elect either to accept such title, possession, and/or access as
136  SELLER can provide or to terminate this Contract by giving SELLER notice of such election not later than 5 days after expiration of the Clearance
137  Period. If BUYER makes no such election, BUYER shall be deemed to have accepted such title, possession and access as SELLER can provide
138  and close within the later of (i) 10 days after expiration of the Clearance Period or (ii) the Closing Date. A monetary lien upon the Property shall
139  not constitute a title defect if said lien can be paid and satisfied from SELLER's proceeds at closing.
140  **STANDARD C—SURVEY; COASTAL CONSTRUCTION CONTROL LINE.**
141  1. **SURVEY AND SURVEY OBJECTIONS:** Unless the Property is a condominium or cooperative unit, SELLER shall furnish to BUYER, not
142  later than 10 days after the Effective Date, a complete copy of any survey of the Property in SELLER's possession and which has been certified
143  to SELLER (together with flood elevation certificate, if applicable). If to SELLER's knowledge there are no improvements or encroachments
144  currently located upon the Property other than as shown on the SELLER's survey, SELLER shall execute an affidavit of "no change" affirming
145  same to BUYER. BUYER may, at BUYER's expense, have the Property surveyed not later than 5 days prior to the Closing Date ("Survey
146  Period"). If the survey, as certified by a registered Florida surveyor, correctly shows: (a) an encroachment onto the Property; (b) that an
147  improvement located on the Property projects onto lands of others; (c) an improvement on the Property violates a zoning, building or other
148  governmental use restriction; (d) an improvement on the Property violates any recorded covenant or restriction, or any covenant of this Contract;
149  or (e) lack of legal access (collectively "Survey Objections"), BUYER may, within the Survey Period, notify SELLER of the Survey Objections and
150  shall furnish a copy of the survey. The Survey Objections shall be treated as a title defect(s). If BUYER fails to obtain a survey within the Survey
151  Period, BUYER waives any right to object to any matters which might have been shown on a survey. If BUYER fails to make any Survey
152  Objections within the Survey Period, BUYER waives any Survey Objections.
153  2. **COASTAL CONSTRUCTION CONTROL LINE:** (a) If any portion of the Property lies seaward of the Coastal Construction Control Line,
154  Florida law requires the following disclosure: The property being purchased may be subject to coastal erosion and to federal, state or local
155  regulations that govern coastal property, including the delineation of the coastal construction control line, rigid coastal protection structures,
156  beach nourishment, and the protection of marine turtles. Additional information can be obtained from the Florida Department of Environmental
157  Protection, including whether there are significant erosion conditions associated with the shoreline of the property being purchased. (b) If any
158  portion of the Property lies seaward of the Coastal Construction Control Line, BUYER waives the right to receive a survey or affidavit from
159  SELLER delineating said line upon the Property.
160  **STANDARD D—DISCLOSURES; INSPECTIONS AND REMEDIES; ELECTION AND RESPONSE; SELLER'S MAINTENANCE
161  OBLIGATION; WALK-THROUGH INSPECTION; RISK OF LOSS.**
162  1. **DISCLOSURES:**
163  A. **SELLER DISCLOSURES:** Except as disclosed to and acknowledged by BUYER prior to BUYER's execution of any offer (or
164  counteroffer, as applicable):
165  1. **GENERAL:** SELLER knows of no facts or conditions materially affecting the value of the Property, except those
166  which are readily observable by BUYER.
167  2. **WETLANDS; SUITABILITY:** SELLER does not know of any portion of the Property having been determined to be
168  wetlands, or of any other condition or circumstance adversely affecting the Property which might impair its suitability for residential use or
169  construction.
170  3. **PERMITS AND VIOLATIONS:** SELLER does not know of any improvements to the Property which were made
171  without proper permit(s) or certificate(s) of occupancy/substantial completion (where required) or of any existing violations of local ordinances or
172  codes, or of any pending code enforcement violations or proceedings affecting the Property.
173  4. **ZONING:** SELLER has not commenced any proceedings to change the current zoning classification of the
174  Property, nor will SELLER initiate any such proceedings. SELLER has not received notice from any third party(ies) of any proceedings which
175  would affect the current zoning classification of the Property. Should SELLER receive any such notice, SELLER will promptly notify BUYER of
176  same, and in that event, BUYER may terminate this Contract by giving SELLER notice of said termination not later than 5 days after receipt of
177  said notice.
178  5. **PAST INSURANCE CLAIMS:** SELLER is unaware of any past insurance claims on the Property which would
179  increase the cost or restrict the availability of insurance coverage for the Property.
180  B. **MANDATORY DISCLOSURES:** The following disclosures are required by governing Florida law and are hereby made a part
181  of this Contract:
182  1. **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in
183  sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines
184  have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health
185  department.



186   2.   **LEAD BASED PAINT/PAINT HAZARDS:** If construction of the residence on the Property was commenced prior to 1978, SELLER is required to complete, and SELLER and BUYER are required to sign and attach to this Contract, the "Addendum to Sales Contract Lead-Based Paint and/or Lead-Based Paint Hazards"

3.   **MOLD:** In Florida, mold is commonly found both indoors and outdoors. Interior infestation by certain mold may cause property damage and health problems for some persons.

4.   **PROPERTY TAX DISCLOSURE:** BUYER should not rely on the SELLER's current property taxes as the amount of property taxes that BUYER may be obligated to pay in the year subsequent to purchase. A change of ownership or property improvements triggers reassessments of the property that could result in higher property taxes. If you have any questions concerning valuation, contact the county property appraiser's office for information.

C.   **ADVISEMENTS AND ACKNOWLEDGMENTS:**

1.   **INSURANCE AVAILABILTY AND COST:** Prior to signing this Contract, BUYER is advised to consult with insurance professionals to ascertain the availability and cost of casualty, wind, and/or flood insurance, and further that insurance may be required if BUYER is financing the purchase.

2.   **SQUARE FOOTAGE:** BUYER is aware that any reference to the square footage and size of the Property and improvements thereon is approximate and is not warranted and should be independently verified by BUYER prior to execution of this Contract.

3.   **MANDATORY/BUNDLED CLUB MEMBERSHIP:** The Property is or may be located in a community with a mandatory or bundled club membership, and BUYER may be required to pay certain initiation and other fees, dues and/or use charges imposed by the club. If BUYER has questions or requires additional information pertaining to applicable club requirements and/or fees, dues and charges, BUYER should contact said club.

4.   **COMMUNITY INVESTIGATION:** BUYER is advised that any condominium, cooperative and/or homeowners' association documents received by BUYER may not include important information about the community(ies) where the Property is located, including without limitation pending foreclosures, types and amounts of insurance coverage, current budget and reserve amounts, and status of delinquent assessments; ownership, financial and membership status of private clubs, golf course(s), marina(s), and other amenities; the status of the developer(s) if the community or any portion thereof is developer-controlled; and facts about the surrounding community(ies), school districts and public and government infrastructure plans. SELLER by signing this Contract designates BUYER as SELLER's representative for purposes of obtaining said information.

5.   **ENERGY EFFICIENCY:** BUYER acknowledges receipt of the Department of Community Affairs brochure on the Florida Building Energy Efficiency Rating System.

6.   **FIRE SPRINKLER/SAFETY SYSTEM RETROFIT:** If the Property is located in a condominium or cooperative building greater than 75 feet in height requiring retrofit for fire sprinklers or other life safety systems as shown on the list created by the local district fire marshal, BUYER may terminate this Contract within the statutory rescission period set forth in Standard I.

7.   **CODE COMPLIANCE BROCHURE:** If the Property is located in unincorporated Collier County, SELLER and BUYER acknowledge receipt of the Collier County Code Compliance Residential Program brochure.

8.   **FAIR HOUSING BROCHURE:** BUYER and SELLER acknowledge receipt of the Equal Opportunity in Housing brochure provided by the National Association of Realtors advising the parties of their rights under the federal Fair Housing Act as well as other federal, state and local laws.

9.   **FEMA 50% RULE:** BUYER is advised that if BUYER intends to make substantial improvements to the Real Property, BUYER's changes may be subject to FEMA regulations limiting improvements to 50% of the value of the existing structure. The substantial improvement requirement applies to any reconstruction, rehabilitation, addition, or other improvement of an existing structure if the lowest living floor elevation is below the Base Flood Elevation as shown on the Flood Insurance Rate Map (FIRM) plus 1 foot AND the cost of the work equals or exceeds 50% of the market value of the structure before the start of construction. It is recommended that BUYER contact the floodplain coordinator at the applicable local government with permitting jurisdiction for further information.

**2. INSPECTIONS:**

a.   **INSPECTION PERIOD; INSPECTION ITEMS:** BUYER shall have ___15___ days [15 days if left blank] after the Effective Date (the "Inspection Period") to have the following inspected at BUYER's expense as follows: (1) the Property and all appliances and equipment, including fire sprinkler, irrigation, well, septic, heating, cooling, electrical, plumbing and security systems; mechanical components; roof (including fascia and soffits); ceilings; walls; windows and doors (including overhead door(s)); foundation; swimming pool, spa and pool/spa deck(s), and pool/lanai enclosure(s); seawall; dock(s); boat lifts/davits and related electrical and mechanical components, if any (collectively "Systems and Equipment"), by an appropriately Florida licensed inspection company and/or licensed contractor who holds a Florida license to repair and maintain the items inspected, and/or (2) radon gas, by a Florida certified radon measurement technician or specialist, and/or (3) lead-based paint or lead-based paint hazards, by an EPA –certified lead exposure risk assessor, and/or (4) termites or other wood-destroying organisms, by a certified pest control operator, and/or (5) air, surface, dust and/or other accepted industry sampling performed by a qualified indoor air quality inspector for the presence of toxic and pathogenic molds, and/or (6) the existence of any Open Permits (defined below), non-conforming structures, unpermitted improvements, or existing violations of local ordinances or codes (collectively the "Inspection Items").

All inspections shall be non-invasive and shall not entail any perforation or removal of structural material unless approved in advance by SELLER. Upon reasonable notice, SELLER shall provide access and utilities service to the Property to facilitate the inspections. BUYER shall repair any and all damage to the Property, Personal Property and Systems and Equipment resulting from or caused by the inspections and shall

otherwise return the Property, Personal Property and Systems and Equipment to their condition prior to the inspections. BUYER will indemnify and hold SELLER harmless from and against all losses, damages, costs, claims and expenses of any nature, including attorney fees (collectively "Losses"), and from and against any liability to any person arising from, out of or in connection with the inspections, except as to Losses resulting from negligence or intentional acts or omissions of SELLER.

    b. **DEFECTIVE INSPECTION ITEMS; BUYER'S ELECTION AND SELLER'S RESPONSE:** Except as to any Defective Inspection Items disclosed to and acknowledged by BUYER prior to BUYER's execution of any offer (or counteroffer, as applicable), if any inspection conducted during the Inspection Period reveals the following (collectively, the "Defective Inspection Items"): (1) that any Systems and Equipment are not in Working Condition, and/or (2) the presence of radon gas at a level at or above EPA action levels (4.0 picocuries per litre of air), and/or (3) the presence of lead-based paint or lead-based paint hazards requiring abatement under HUD/EPA protocols, and/or (4) the existence of active infestation by termites or other wood-destroying organisms and/or visible damage caused by active or past infestation, and/or (5) the presence of toxic or pathogenic molds within the interior of the dwelling(s) exceeding the levels of such molds measured upon the exterior of the dwelling (penicillium aspergillus and other allergenic molds exceeding the levels of such molds measured upon the exterior of the dwelling shall not be deemed a Defective Inspection Item for purposes of this Contract), and/or (6) any void, expired, issued, open, under review or other building permits which have not been finaled, completed, issued a certificate of occupancy or completion or otherwise resolved without necessity of further action as documented by the applicable governmental agency (collectively "Open Permits"), or any unlawful non-conforming structures, or any unpermitted improvements, or existing violations of local ordinances or codes, and if BUYER elects recourse from SELLER for any Defective Inspection Item(s), BUYER shall, not later than 5 days after expiration of the Inspection Period ("BUYER's Election Deadline"): (a) notify SELLER of any Defective Inspection Items, and (b) furnish to SELLER a complete copy of the inspection report(s) documenting the Defective Inspection Items, and (c) notify SELLER of BUYER's election either to: (i) have SELLER, at SELLER's expense, make or cause any repairs, replacements, treatment, mitigation or other remedial action necessary to bring the Defective Inspection Items into compliance with the relevant standards herein (the "Remedial Action"); (ii) receive a credit from SELLER at closing in lieu of Remedial Action; or (iii) a combination of (i) and (ii) (either (i), (ii) or (iii) being referred to as "Buyer's Election"). If BUYER elects to receive a credit, the amount of the credit shall be stated at the time of the BUYER's Election, and be equivalent to the estimated costs of the Remedial Action, as evidenced by written estimates/proposals issued to BUYER by parties appropriately licensed to perform said Remedial Action. If BUYER makes no election, BUYER shall be deemed to have accepted the Property and Systems and Equipment in the condition they existed on the Effective Date, subject to the provisions of Standard D.2.d. (2), (3), and (4). The scope of BUYER's Election shall not include or extend to any item for which SELLER has no maintenance, repair or replacement obligation under the governing documents of any applicable condominium or homeowners' association. Except for BUYER's Permit Election, the BUYER shall be entitled to one BUYER's Election.

    Not later than 10 days after receipt of all of the complete inspection report(s) relating to BUYER's Election and BUYER's Election ("SELLER's Response Deadline"), SELLER shall notify BUYER whether SELLER agrees to, refuses or counters BUYER's Election ("SELLER's Response"). If SELLER refuses or counters BUYER's Election with respect to any Defective Inspection Item(s) by the SELLER's Response Deadline, then BUYER may terminate this Contract not later than 5 days after receipt of SELLER's Response. If SELLER refuses BUYER's election with respect to any Defective Inspection Item(s) by SELLER's Response Deadline and BUYER does not elect to terminate this Contract, BUYER is deemed to have accepted the Property and Systems and Equipment in the condition they existed on the Effective Date, except that BUYER retains the walk-through inspection rights set forth in Standard D.2.d.(2),(3), and (4) below. Notwithstanding the foregoing, if SELLER counters BUYER's Election with respect to any Defective Inspection Item(s) and BUYER does not timely elect to terminate this Contract, BUYER is deemed to have accepted SELLER's Response to BUYER's Election. If SELLER fails to respond by the SELLER's Response Deadline, SELLER shall be deemed to have refused BUYER's Election with respect to any Defective Inspection Item(s), and BUYER may terminate this Contract not later than 5 days after the SELLER's Response Deadline.

    Notwithstanding the deadlines stated in this Standard D.2, if BUYER or BUYER's designated representative conducts a permit search of the records from the governmental agency with permitting jurisdiction over the Property within five (5) days of the Effective Date and the permit search results are not obtained within the Inspection Period, the time period for the BUYER's Election with respect to any Open Permits ("Permit Election") is hereby extended to five (5) days after BUYER's receipt of the permit search. In such case, the SELLER's Response Deadline with respect to BUYER's Permit Election is extended to ten (10) days after receipt of BUYER's Permit Election. All other rights and obligations of the parties with respect to Open Permits under this Standard D.2 shall apply. Nothing in this paragraph shall extend the Closing Date.

    If any Remedial Action requested by BUYER requires the approval of any community association governing the Property, and SELLER fails to furnish BUYER with written documentation of said association's approval not later than 5 days prior to the Closing Date, BUYER may terminate this Contract.

    If BUYER does not have the Inspection Items inspected, or fails to do so within the Inspection Period, or fails to timely report any Defective Inspection Items to SELLER, BUYER shall be deemed to have accepted the Property and Systems and Equipment in the condition they existed on the Effective Date, except that BUYER retains the rights set forth in Standard D.2.d.(2), (3), and (4) below.

    Remedial Action shall be deemed to have been properly performed when (1) the Systems and Equipment are placed in Working Condition, (2) radon gas within the residence on the Property is reduced to below EPA action levels, (3) lead-based paint and paint hazards on the Property are removed or contained in accordance with HUD/EPA guidelines, (4) any active infestation of termites or other wood-destroying organisms is exterminated or treated, and all visible damage caused by active or past infestation is repaired or replaced; and (5) toxic or pathogenic molds are no longer present within the dwelling(s) at levels exceeding those measured upon the exterior of the dwelling, and (6) written documentation is provided from the appropriate government authority evidencing that all Open Permits have been closed out and/or all structures lawfully exist on the Property and/or all unpermitted improvements to the Property have now been properly permitted and said permits closed out and all violations of local ordinances and codes are corrected. SELLER shall make a diligent effort to perform and complete all

302  Remedial Action prior to the Closing Date, failing which a sum equivalent to 200% of the estimated costs of completing the Remedial Action, as
303  shown in the written proposal(s) and without regard to any deposit prepaid by SELLER for said Remedial Action, shall be paid by SELLER into
304  escrow at closing pending SELLER's completion of the Remedial Action. The escrow sum is not a cap on SELLER's liability for completion of
305  the Remedial Action.
306  Systems and Equipment shall be deemed to be in Working Condition if operating in the manner designed to operate. The roof, ceiling,
307  interior and exterior doors and walls, foundation, swimming pool, spa and pool/spa deck(s) shall be in Working Condition if structurally sound,
308  watertight and free from wood rot. Seawalls, docks, and pool/lanai enclosure(s) shall be in Working Condition if structurally sound. SELLER shall
309  not be obligated to take Remedial Action or grant a credit in lieu of Remedial Action with regard to any Cosmetic Condition, which is defined as
310  an aesthetic imperfection which does not affect the Working Condition of the item, including corrosion; tears; worn spots; discoloration of floor
311  covering or wallpaper or window treatments; missing or torn screens; nail holes; scratches; dents; chips; caulking; pitted pool surfaces; minor
312  cracks in windows, driveways, sidewalks, pool/spa decks and garage, tile, lanai and patio floors; and cracked roof tiles, curling or worn shingles
313  and limited roof life, so long as there is no evidence of structural damage or leakage.
314  No cost to repair or replace any Systems and Equipment item shall exceed the fair market value of that item if it were in Working
315  Condition.

316  **c. SELLER'S MAINTENANCE OBLIGATION:** SELLER shall maintain the Property (which for reference includes the Landscaping and
317  Systems and Equipment) and Personal Property in the condition existing on the Effective Date until the Closing Date or date of possession,
318  whichever is earlier, except for ordinary wear and tear and any Remedial Action agreed to by SELLER under Standard D.2.b. above (collectively,
319  "SELLER's Maintenance Obligation"). The scope of SELLER's Maintenance Obligation shall not include or extend to any item for which SELLER
320  has no maintenance, repair or replacement obligation under the governing documents of any applicable condominium or homeowners'
321  association. If SELLER fails to perform SELLER's Maintenance Obligation as required in this Standard, SELLER shall, at BUYER's request,
322  either (i) perform appropriate repair, replacement, treatment mitigation or other remedial action necessary to comply with Seller's Maintenance
323  Obligation with respect to the Property and/or repair or replace the Personal Property to the condition required by this Standard prior to the
324  Closing Date (collectively, "Maintenance Obligation Remedial Action"), or (ii) provide a credit acceptable to BUYER at closing equivalent to the
325  estimated cost of the Maintenance Obligation Remedial Action required by this Standard. If SELLER is obligated to perform the Maintenance
326  Obligation Remedial Action and fails to do so prior to the Closing Date and the parties are unable to agree upon a credit amount, SELLER shall
327  escrow at closing a sum equivalent to 200% of the estimated costs for payment to appropriately licensed contractor(s) performing the
328  Maintenance Obligation Remedial Action. The escrow sum is not a cap on SELLER's liability for completion of the Maintenance Obligation
329  Remedial Action.

330  **d. WALK-THROUGH INSPECTION:** BUYER (or a designated representative) may conduct a walk-through inspection of the Property prior
331  to closing or possession, whichever is earlier, to confirm: (1) completion of any Remedial Action agreed to by SELLER in Standard D.2.b. above,
332  (2) that the items being conveyed as part of this Contract remain on the Property, (3) that the items which are not being conveyed as part of this
333  Contract have been removed from the Property, and (4) that SELLER has performed SELLER's Maintenance Obligation and, if applicable, any
334  Maintenance Obligation Remedial Action as required in Standard D.2.c above. Upon reasonable notice, SELLER shall provide access and
335  utilities service to the Property to facilitate the walk-through inspection.

336  **e. RISK OF LOSS; CASUALTY; INSURANCE AND SERVICES ESSENTIAL FOR CLOSING; LIMITED PURPOSE INSPECTION
337  RIGHTS; EXTREME WEATHER CONDITION:**
338  (i) **RISK OF LOSS.** Any loss or damage to the Property (which for reference includes the Landscaping and Systems and
339  Equipment) or Personal Property caused by fire, flood, extreme weather conditions or other casualty occurring between the Effective Date of this
340  Contract and the Closing Date or date of possession, whichever is earlier ("Casualty"), shall be at SELLER's sole risk and expense. SELLER
341  shall maintain all existing casualty, wind, hurricane and flood insurance until disbursement.
342  (ii) **AVAILABILITY OF INSURANCE AND SERVICES ESSENTIAL FOR CLOSING.** If, as a result of the Casualty, BUYER is
343  unable to obtain hazard, flood, wind or homeowner's insurance or is unable to obtain such insurance at a reasonable rate and/or if services
344  essential for closing are not available by the Closing Date as a result of the Casualty, BUYER may delay the Closing Date until a date that is up
345  to 5 days after said coverage becomes available and services essential for closing are restored. If said coverage is not available and/or said
346  essential services are not restored for a period of 30 continuous days after the Casualty date, either SELLER or BUYER may terminate this
347  Contract not later than 35 days after the Casualty date.
348  (iii) **PROPERTY RENDERED UNINSURABLE OR UNFIT FOR HABITATION.** If any such Casualty loss or damage renders the
349  Property on the Closing Date either: (1) uninsurable under the residential underwriting guidelines of the Citizens Property Insurance Corporation,
350  as documented in a letter from SELLER's or BUYER's insurance agent or underwriter; or (2) unfit for habitation under state or local building
351  codes; as documented in a letter issued by the governmental agency having jurisdiction over said matters pertaining to the Property, then either
352  BUYER or SELLER may terminate this Contract not later than 5 days after receipt of said documentation.
353  (iv) **LANDSCAPING.** Notwithstanding the provisions of Standard D.2.c or Standard D.2.e(i), if any loss or damage to the
354  Landscaping is caused by a Casualty or other event beyond SELLER's control, SELLER's financial obligation for restoration of the Landscaping
355  to the condition it existed on the Effective Date (to the extent reasonably practicable based on availability of substantially equivalent replacement
356  Landscaping) shall not exceed 1% of the purchase price.
357  (v) **BUYER LIMITED PURPOSE POST-CASUALTY INSPECTION RIGHTS.** Not later than 5 days after SELLER notifies
358  BUYER that safe access to the Property is available following a Casualty, BUYER and/or BUYER's designated representative(s) may conduct
359  an inspection of the Property (in addition to any walk-through inspection that BUYER may have conducted prior to the Casualty and/or is entitled
360  to prior to closing), for the limited purpose of identifying any loss or damage to the Property, the Personal Property and Systems and Equipment



361 as a result of the Casualty ("Post-Casualty Inspection"). SELLER shall provide access and utilities service to the Property to the greatest extent
362 possible based on the availability of such service to facilitate the Post-Casualty Inspection.
363 ~~(vi) **EXTREME WEATHER CONDITION:** If, due to a pending or threatened hurricane, tropical storm, or other extreme weather~~
364 condition, BUYER is unable to obtain hazard, flood, wind or homeowners/casualty insurance coverage at a reasonable rate for closing, or if
365 services essential for closing are not available, BUYER or SELLER may delay the Closing Date until a date that is not more than 5 days after
366 insurance coverage becomes available and/or services essential for closing are restored. If such insurance coverage and/or services essential
367 for closing remain unavailable for a period of 30 continuous days, then either SELLER or BUYER may terminate the Contract not later than 35
368 days after such extreme weather condition rendered insurance and/or services essential for closing unavailable.

369 **STANDARD E—SELLER'S INSTRUMENTS AND EXPENSES.** SELLER shall pay for and provide, when applicable: (1) the title evidence or
370 credit specified in Standard B; (2) if the Property is located in Lee or Charlotte County, the premium for the owner's title insurance policy issued
371 by the closing agent selected by BUYER, and the charges for title search and title continuation through the date of deed recording; (3) preparation
372 of statutory warranty deed (or special warranty deed if SELLER is a fiduciary), bill of sale with warranties of ownership and freedom from
373 encumbrances, condominium/homeowners' association estoppel letter(s), broker compensation verifications; tenant estoppel letter(s),
374 copy(ies) and assignment(s) of lease(s), and an affidavit regarding liens, possession, and withholding under FIRPTA, in a form sufficient to allow
375 "gap" coverage by title insurance; (4) mortgage payoff letter from existing creditor/lender(s); (5) documentary stamp tax on deed; (6) real estate
376 brokerage compensation contractually agreed to by SELLER (to be disbursed by closing agent at closing); (7) utility services to the Closing Date;
377 (8) any condominium/homeowners' association special assessments and governmentally imposed liens or special assessments which are
378 SELLER's obligation under Paragraph 6; (9) SELLER's attorney fees, (10) if SELLER is subject to withholding under FIRPTA, charges associated
379 with withholding, escrowing and/or remitting funds, and/or preparing the withholding certificate application and/or tax return related thereto; (11)
380 reimbursement of prepaid estoppel fees and other costs advanced on behalf of SELLER; and (12) wire fees associated with transfer(s) of
381 SELLER proceeds and payoffs.

382 **STANDARD F—BUYER'S INSTRUMENTS AND EXPENSES.** BUYER shall pay for and provide, when applicable, including any sales tax due
383 thereon: (1) recording fee for deed; (2) all costs of any institutional loan secured by BUYER; (3) the premium for creditor/lender title insurance
384 policy, and if the Property is located in Collier County, the premium for the owner's title insurance policy issued by the closing agent selected by
385 BUYER and the charges for title search, and title continuation through the date of deed recording; (4) recording membership approval; (5) survey
386 charges; (6) condominium/homeowners' association membership transfer fee; (7) condominium/homeowners' association resale transfer
387 fee/capital contribution; (8) any pending condominium/homeowners' association special assessments and governmentally imposed liens or
388 special assessments which are not SELLER's obligation under Paragraph 6; (9) real estate brokerage compensation contractually agreed to by
389 BUYER (to be disbursed by closing agent at closing); (10) BUYER's attorney fees; (11) BUYER shall promptly pay and indemnify and hold
390 SELLER harmless against any claims or liens upon the Property for surveyor or other services furnished to the Property at the request of BUYER;
391 (12) code enforcement/municipal lien search fees; (13) reimbursement of prepaid application fees and other costs advanced on behalf of BUYER;
392 (14) reimbursement to the closing agent of any deposit and closing funds shortages due to deduction of wire fees; and (15) submerged land
393 lease assignment and transfer fees, including any applicable sales tax.

394 **STANDARD G—PRORATIONS; CREDITS.** These items will be prorated as of the Closing Date, with BUYER charged with and entitled to the
395 Closing Date, or the possession date, whichever is earlier: (1) real and personal property taxes based on the current year, if available. If not
396 available, the taxes shall be based on the TRIM "Your Taxes This Year if PROPOSED Budget is Adopted" amount and current year non-ad
397 valorem amount(s), if available; otherwise the prior year non-ad valorem amounts. If neither the current year tax nor TRIM amounts are available,
398 the taxes shall be based on the prior year's bill (without discount or exemptions no longer available in the year of closing). If completed
399 improvements exist on the Property for which a certificate of occupancy was issued as of January 1st of the year of closing, which did not exist
400 on January 1st of the prior year, taxes shall be estimated for proration by applying the current year millage rate to the current year taxable value
401 of the Property. If the current year millage rate is not fixed, the prior year millage rate shall be applied. If the current year taxable value is not
402 fixed, the taxes shall be estimated for proration by applying the most current fixed millage rate to a sum equivalent to 80% of the purchase price.
403 A tax proration based upon any estimated tax shall, at the request of either party, be re-prorated based on the actual tax bill amount with
404 maximum discount; (2) interest on any assumed indebtedness; (3) rents; (4) condominium/homeowners' association assessments and
405 CDD/MSTU operating and maintenance assessments; (5) county waste assessments; (6) appliance service contracts assumed by BUYER; and
406 (7) propane gas. BUYER shall receive from SELLER at closing a credit equivalent to the amount of any security deposit and prepaid rents held
407 by SELLER, and any accrued interest thereon, or alternatively, ownership or an assignment of the account in which the deposits and prepaid
408 rents, and any accrued interest thereon, are held.

409 **STANDARD H—HOMEOWNERS' ASSOCIATION DISCLOSURE.** If the Property is located within and governed by any mandatory
410 homeowners' association, the following provisions are incorporated into this Contract:

411 **IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE
412 PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY
413 DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL
414 WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY
415 PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE
416 AT CLOSING.**

417  BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE "HOMEOWNERS' ASSOCIATION
418  DISCLOSURE SUMMARY," WHICH IS ATTACHED TO AND MADE A PART OF THIS CONTRACT.
419  ~~STANDARD I—CONDOMINIUM RESALE DISCLOSURE; VOIDABILITY RIGHTS.~~ If the Property is a condominium unit(s), the following
420  provisions are incorporated into this Contract: **THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE**
421  **BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS AND LEGAL HOLIDAYS, AFTER THE DATE**
422  **OF EXECUTION OF THIS AGREEMENT BY THE BUYER AND RECEIPT BY BUYER OF A CURRENT COPY OF THE DECLARATION OF**
423  **CONDOMINIUM, ARTICLES OF INCORPORATION, BYLAWS, AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST**
424  **RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF SO**
425  **REQUESTED IN WRITING. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY**
426  **EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS AND LEGAL**
427  **HOLIDAYS, AFTER THE BUYER RECEIVES THE DECLARATION, ARTICLES OF INCORPORATION, BYLAWS, AND RULES OF THE**
428  **ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS**
429  **AND ANSWERS DOCUMENT IF REQUESTED IN WRITING. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT**
430  **CLOSING.** BUYER shall also be entitled to receive a copy of the Condominium Governance Form required by Florida Statutes, and the above
431  stated right of BUYER to cancel this Contract shall apply to BUYER's receipt of said governance form in the same manner as applies to the other
432  above-referenced condominium documents. BUYER, by its execution of this Contract, hereby requests a current copy of the above referenced
433  condominium documents and Condominium Governance Form.
434  **STANDARD J—CONDOMINIUM/HOMEOWNERS' ASSOCIATION PROVISIONS; MEMBERSHIP APPROVAL.** Any condominium/
435  homeowners' association reserve account(s) is included in the purchase price. If association membership approval is required, BUYER shall,
436  not later than 10 days after the Effective Date, make application for same in the name(s) in which title will be taken, and shall comply with all
437  governing requirements of the association and be responsible for securing membership approval. If no written approval has been obtained from
438  the applicable condominium/homeowners' association by the Closing Date, either BUYER or SELLER may terminate this Contract by giving the
439  other party notice of said termination prior to receipt of the approval. SELLER shall obtain a letter(s) from the association(s) which sets forth the
440  amounts, periods and payment status of assessments and transfer fees and resale capital assessments and deliver same to the BUYER not
441  later than 15 days prior to the Closing Date. Some condominiums exist upon a leasehold estate or have associated recreational leases which
442  may require the payment of rents, taxes, maintenance, replacement and repair. BUYER takes title subject to any such lease. **IF THE**
443  **CONDOMINIUM UNIT EXISTS UPON A LEASEHOLD ESTATE AND THE REMAINING TERM ON ANY GROUND LEASE IS FEWER THAN**
444  **40 YEARS AS OF THE EFFECTIVE DATE, BUYER MAY TERMINATE THIS SALES CONTRACT BY GIVING SELLER WRITTEN NOTICE**
445  **OF SAID TERMINATION WITHIN THE EXAMINATION PERIOD DEFINED IN STANDARD B.** SELLER will assign its sublease to BUYER at
446  closing.
447  **STANDARD K—MORTGAGE CREDITOR/LENDER POLICIES.** If BUYER elected to obtain mortgage financing under Paragraph 4.B., the
448  policies of the creditor/lender shall prevail as to the procedures for closing and disbursement of mortgage loan proceeds.
449  **STANDARD L—ESCROW; ESCROW AGENT(S).** The escrow agent who accepts in escrow the deposit(s) paid under this Contract (the "Escrow
450  Agent") shall hold the deposit(s) within the State of Florida in escrow until the earlier of: (1) delivery to another Escrow Agent for closing, who by
451  acceptance agrees to these terms and becomes the Escrow Agent (the Escrow Agent holding the deposit(s) is authorized to so transfer the
452  funds and is relieved of all liability for the funds delivered); (2) delivery of the deed, with payment of the deposit(s) as part of the purchase price
453  of the Property; (3) such time as BUYER may be entitled to return of the deposit(s); or (4) delivery pursuant to written direction of the parties, at
454  which time the Escrow Agent shall pay all of the deposit(s) to the party(ies) entitled thereto. The Escrow Agent shall not be liable for the payment
455  of any interest, damages, attorney fees or court costs in any action brought to recover the deposit(s) held in escrow, or any part thereof, unless
456  the Escrow Agent shall fail or refuse to pay over any such deposit(s) pursuant to a judgment, order or decree that shall be final beyond possibility
457  of appeal. In any proceeding which litigates the disposition of the deposit(s), the Escrow Agent shall be entitled to be paid reasonable attorney
458  fees and court costs, which shall be paid by the non-prevailing party. The Escrow Agent has no duty to collect or attempt to collect any deposit
459  or check given as a deposit, but shall give the parties written notice of: (a) any deposit that is not received not later than 5 days after its due date,
460  and (b) any deposit check that is not paid on presentation, not later than 5 days of learning of its dishonor. If the Escrow Agent is a licensed real
461  estate broker, the Escrow Agent shall comply with the requirements of Chapter 475, Florida Statutes.
462  **STANDARD M—FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT (FIRPTA) WITHHOLDING.** A SELLER who is a U.S. citizen or
463  resident alien and who furnishes BUYER with an affidavit attesting to same, is exempt from FIRPTA withholding. If SELLER is a foreign person
464  or entity, BUYER shall deduct and withhold from the purchase price, or collect from SELLER if the net proceeds are insufficient, 15% of the
465  purchase price (the "Withholding Amount"), and remit same to the Internal Revenue Service (the "IRS") within 10 days after the Closing Date,
466  unless: (1) the purchase price is not more than $300,000.00 and BUYER executes a sworn certification at closing attesting that BUYER is
467  acquiring the Property for use as a residence; i.e. that BUYER or a member of BUYER's family has definite plans to reside at the Property at
468  least 50% of the number of days the Property is used by any person in each of the first two 12-month periods immediately following the closing,
469  in accordance with the Internal Revenue Code and all applicable regulations (the "BUYER's Residential Use Certification"), in which event the
470  Withholding Amount is $0; or (2) the purchase price is greater than $300,000.00 but not more than $1,000,000.00 and BUYER executes a
471  BUYER's Residential Use Certification, in which event the Withholding Amount is reduced to 10% of the purchase price. If SELLER furnishes to
472  BUYER, not later than the Closing Date, proof of submittal to the IRS of an application for withholding certificate, the closing agent (or other third
473  party mutually designated by SELLER and BUYER) shall hold the applicable Withholding Amount in escrow pending receipt of the withholding

474 certificate, shall remit the sum reflected in the withholding certificate to the IRS within 10 days of receipt of the withholding certificate, and shall
475 promptly refund any remaining balance to SELLER. SELLER shall hold BUYER harmless and indemnify BUYER for not withholding or collecting
476 the applicable Withholding Amount or for withholding and remitting the reduced amount reflected in the withholding certificate. BUYER shall
477 provide to SELLER evidence of remittance of all or any portion of the applicable Withholding Amount to the IRS. The failure of either party to
478 comply or to allow compliance with the requirements of FIRPTA and related regulations shall constitute a breach of this Contract.
479 **STANDARD N—QUICK CLOSING.** Except with respect to the Clearance Period in Standard B or as otherwise set forth in Standard J, if the
480 Closing Date does not allow sufficient time for performances by SELLER and BUYER within the time frames and by the deadlines set forth in
481 this Contract, the parties agree to undertake and complete all performances, inspections, surveys, examinations, delivery of documents, notices,
482 satisfaction of contingencies and all other actions required of or allowed to either party prior to the Closing Date, except that the statutory time
483 period set forth in Standards H and I shall not be affected by this provision.
484 **STANDARD O—DEFAULT AND REMEDIES.** If BUYER does not perform BUYER's obligations hereunder (except as excused by SELLER's
485 default) all deposits made shall be paid to SELLER as liquidated damages, which shall be SELLER's exclusive remedy. If SELLER does not
486 perform SELLER's obligations hereunder (except as excused by BUYER's default), BUYER may enforce this Contract by a suit for specific
487 performance, damages, or may terminate this Contract.
488 **STANDARD P—LITIGATION; ATTORNEY FEES AND COSTS.** In connection with any litigation concerning this Contract, venue shall be in the
489 county where the Property is located, and the prevailing party shall be entitled to recover reasonable attorney fees and court costs, including on
490 any appeals, from the non-prevailing party. The term "prevailing party" shall include SELLER, BUYER, and any broker acting in an agency or
491 non-agency relationship recognized under Chapter 475, Florida Statutes. For purposes of this Standard, any such broker shall be an intended
492 third-party beneficiary.
493 **STANDARD Q—NOTICES, DISCLOSURES, ACKNOWLEDGMENTS AND DOCUMENTS. All notices, disclosures and acknowledgments**
494 **must be in writing.** Unless a party is required by law to deliver notices, disclosures, acknowledgments or documents directly to the other party,
495 all notices, disclosures, acknowledgments and documents required or permitted under this Contract shall be effective when given by a party or
496 that party's broker or attorney to the other party or said other party's broker or attorney. Delivery of homeowners' or condominium documents
497 required under Standards H and I respectively to BUYER's broker or attorney shall not constitute delivery to the BUYER.
498 **STANDARD R—MISCELLANEOUS.** (1) **The parties have agreed to deal in good faith with respect to all provisions of this Contract.**
499 (2) The singular case or tense shall include the plural case or tense. (3) This Contract may only be modified in writing signed by the parties.
500 (4) Except as otherwise specifically provided, all references to days shall mean calendar days. (5) Except as otherwise specifically provided, all
501 deadlines shall expire at 11:59 PM Eastern Time. Except as otherwise expressly provided by law, if the Closing Date, any deadline or the last
502 day of any time period falls on a Saturday, Sunday, or federal legal holiday, said deadline shall be extended to the following business day. (6)
503 As used herein, the terms "real estate broker" or "broker" shall include all real estate brokers, brokerage corporations or business entities, and
504 their respective licensees involved in this transaction. (7) All title evidence, condominium documents and other documents provided to BUYER
505 by or on behalf of SELLER are the property of SELLER until closing and shall be immediately returned to SELLER if this Contract is terminated.
506 (8) If either SELLER or BUYER is permitted to terminate this Contract, said party shall do so by giving notice of said termination to the other
507 party, whereupon all deposits made by BUYER shall be promptly returned to BUYER, this Contract shall be of no further force and effect, and
508 the parties shall have no further liability to one another hereunder except as set forth herein. (9) The headings used in this Contract are for
509 convenience of reference only and shall not be used for interpreting the meaning of any provisions of this Contract. (10) All provisions of this
510 Contract which by their nature or context require performance or provide rights after the Closing Date, including without limitation the provisions
511 of Standard P, shall survive closing. (11) Signatures and initials communicated by electronic or facsimile transmission shall be binding. (12) A
512 facsimile or electronic (including "pdf") copy of this Contract and all related sale documents, and any signatures thereon shall be considered for
513 all purposes as an original. This Contract and all related sale documents may be executed by use of electronic signatures, as determined by
514 Florida's Electronic Signature Act and other applicable laws. (13) This Contract and all related sale documents may be signed in counterparts
515 and said counterparts shall collectively constitute the entire agreement of the parties. (14) Upon reasonable notice, SELLER shall provide access
516 to the Property to appraiser(s) and surveyor(s) retained by BUYER. (15) SELLER and BUYER authorize the closing agent to provide copies of
517 the American Land Title Association (ALTA) and other settlement statements to all parties, brokers and attorneys associated with this transaction.
518 **STANDARD S—NEGOTIATED TERMS; REPRESENTATIONS.** Any and all terms negotiated between the parties must be written into this
519 Contract. BUYER's decision to buy was based upon BUYER's own investigations of the Property. BUYER holds the broker(s) harmless from all
520 liability or loss caused by SELLER's failure to disclose material facts in accordance with this Contract, or SELLER's representations regarding
521 the Property's condition, or from broker's referral, recommendation, or retention of any vendor. The parties agree that assistance to a party by a
522 broker does not, and will not, make the broker responsible for performance.
523 **STANDARD T—BINDING CONTRACT; LEGAL COUNSEL.** THE PARTIES ARE NOT REQUIRED TO USE ANY PARTICULAR FORM OF
524 CONTRACT. TERMS AND CONDITIONS SHOULD BE NEGOTIATED BASED UPON THE RESPECTIVE INTERESTS, OBJECTIVES AND
525 BARGAINING POSITIONS OF THE PARTIES. APPROVAL OF THIS FORM BY THE COLLIER COUNTY BAR ASSOCIATION AND
526 ASSOCIATIONS OF REALTORS DOES NOT CONSTITUTE AN OPINION THAT ANY OF THE TERMS AND CONDITIONS IN THIS
527 CONTRACT SHOULD BE ACCEPTED BY A PARTY IN A PARTICULAR TRANSACTION. THIS IS A LEGALLY BINDING CONTRACT FORM.
528 EACH PARTY ACKNOWLEDGES THAT PRIOR TO SIGNING THE CONTRACT, THE CLOSING EXPENSES HAVE BEEN EXPLAINED, REAL
529 ESTATE TRANSACTION STANDARDS A THROUGH T HAVE BEEN RECEIVED AND REVIEWED, AND THAT PARTY HAS BEEN ADVISED
530 BY THE REAL ESTATE BROKER TO SEEK LEGAL COUNSEL AND TITLE INSURANCE TO PROTECT THAT PARTY'S INTEREST IN



531 CONNECTION WITH THE TITLE STATUS AND CLOSING OF THIS TRANSACTION. BUYER AND SELLER ARE ADVISED TO CONSULT AN
532 APPROPRIATE PROFESSIONAL FOR LEGAL, TAX, PROPERTY CONDITION, ENVIRONMENTAL, AND OTHER SPECIALIZED ADVICE.
533 THIS CONTRACT SHALL BE BINDING UPON AND INURE TO THE BENEFIT OF THE PARTIES HERETO, THEIR HEIRS,
534 ADMINISTRATORS, PERSONAL REPRESENTATIVES, AND SUCCESSORS IN INTEREST.

535 **OTHER TERMS AND CONDITIONS:** [SG]
536 Upstairs guest bathroom to include frameless shower door (sliding) SK [SG]
537 Master bathroom chandelier to be included (photo attached) SK [SG]
538 Silk palm tree in ~~mast~~ study to be delivered and included SK [SG]
539 Mosquito and bug mister to be included SK [SG]
540 Interior Designer will assist with wireless blind selection SK [SG]
541 Builder to assist with bug screen should Buyer desire assistance SK
542 _____ [SG]
543 _____

544 **ADDENDUM:** The following Addendum/Addenda is/are attached hereto and incorporated into this Contract:
545 See Personal Property Inventory + Exhibit A [SG] SK
546 _____
547 _____
548 _____

549 To the extent such Addendum/Addenda terms conflict with the terms of this Contract, the Addendum/Addenda terms shall control.

550 **THE REAL ESTATE TRANSACTION STANDARDS SHOULD NOT BE REVISED OR MODIFIED EXCEPT IN OTHER TERMS AND**
551 **CONDITIONS AND/OR BY ADDENDUM/ADDENDA.**

552 **WIRE FRAUD ADVISORY.** CYBER CRIMINALS ATTEMPTING TO STEAL LARGE SUMS OF MONEY ARE TARGETING REAL ESTATE
553 TRANSACTIONS BY INTERCEPTING ELECTRONIC COMMUNICATIONS AND SENDING EMAILS THAT APPEAR TO BE FROM REAL
554 ESTATE AGENTS, BROKERS, ATTORNEYS, TITLE COMPANIES, LENDERS AND OTHERS INVOLVED IN REAL ESTATE
555 TRANSACTIONS. THESE CRIMINALS HAVE INTERCEPTED WIRE TRANSFER INSTRUCTIONS, OBTAINED ACCOUNT INFORMATION,
556 AND, BY ALTERING SOME OF THE DATA, USED EMAILS TO CONVINCE BUYERS, SELLERS AND OTHERS TO REDIRECT THE MONEY
557 TO A FRAUDULENT ACCOUNT. THESE EMAILS ARE SOPHISTICATED AND MAY LOOK LIKE LEGITIMATE EMAILS FROM PARTIES
558 INVOLVED IN THE TRANSACTION. BUYER AND SELLER ARE STRONGLY ENCOURAGED NOT TO SEND PERSONAL INFORMATION,
559 SUCH AS BANK ACCOUNT NUMBERS OR OTHER NON-PUBLIC INFORMATION, VIA UNSECURED EMAIL OR OTHER ELECTRONIC
560 COMMUNICATION, AND TO NEVER WIRE TRANSFER MONEY WITHOUT PERSONALLY SPEAKING WITH THE INTENDED RECIPIENT
561 OF THE WIRE TRANSFER TO VERIFY THE ROUTING AND ACCOUNT NUMBERS. BUYER AND SELLER HEREBY AGREE TO
562 INDEMNIFY AND HOLD HARMLESS ESCROW AGENT, ANY CLOSING AGENT AND ANY BROKER ACTING IN AN AGENCY OR NON-
563 AGENCY RELATIONSHIP RECOGNIZED UNDER CHAPTER 475, FLORIDA STATUTES, FROM ALL LOSSES, LIABILITIES, CHARGES
564 AND COSTS INCURRED DUE TO ANY WIRE TRANSFERS OR WIRE INSTRUCTIONS WHICH RELATE TO THE TRANSFER OR
565 ISSUANCE OF FUNDS. FOR PURPOSES OF THIS PARAGRAPH, ESCROW AGENT, ANY CLOSING AGENT AND ANY BROKER SHALL
566 BE INTENDED THIRD-PARTY BENEFICIARIES.

_Seagate Charm LLC, by SNOK, Member_ (Seller's Signature)   (Date)

*Simone Gold*   11/14/2021
(Buyer's Signature)   (Date)

**Seagate Charm LLC**, by Stuart Kaye, Member Manager   11/16/21
(Seller's Printed Name)

*Simone Gold*
(Buyer's Printed Name)

_____
(Seller's Signature)   (Date)

_____
(Buyer's Signature)   (Date)

_____
(Seller's Printed Name)

_____
(Buyer's Printed Name)

567 SELLER rejects BUYER'S offer on _____ {Insert Date}.

568
569 _____ (Seller's Signature)     _____ (Seller's Signature)

570 **IDENTIFICATION OF BROKERS AND LICENSEES**

571 Listing Brokerage: **Kaye Realty Inc.**       Selling Brokerage: **John R Wood Properties**
572 Listing Licensee: **Stuart O Kaye**          Selling Licensee: **Blaze Zdravev**
573 IDENTIFICATION OF ESCROW AGENT Escrow Agent's Name: **Michael Gentzle**
574 Escrow Agent Address: **4001 Tamiami Trail North, Suite 300**
575 Escrow Agent Telephone: _____ Fax: _____ Email: **mgentzle@cyklawfirm.com**

576 THIS CONTRACT SHALL NOT MODIFY THE LISTING CONTRACT OR ANY MLS OR OTHER OFFER OF COMPENSATION MADE BY
577 SELLER OR LISTING BROKER TO COOPERATING BROKERS.