UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION


FREE SPEECH FOUNDATION,
INC. d/b/a AMERICA'S
FRONTLINE DOCTORS, an
Arizona nonprofit corporation,
and JOSEPH GILBERT,

     Plaintiffs,

v.                               Case No.:  2:22-cv-714-SPC-NPM

SIMONE GOLD,

     Defendant.

_____/


**DEFENDANT SIMONE GOLD'S RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

Defendant Dr. Simone Gold ("Gold") responds in opposition to Plaintiffs' Motion for Preliminary Injunction (the ("Motion") (Doc. 7). If the Court does not deny the Motion on the briefing—and there are several reasons to do so—Gold requests an evidentiary hearing to vindicate herself from Plaintiffs' false allegations.

## I.      INTRODUCTION AND ARGUMENT SUMMARY

Inside the standard four-part rubric for consideration of preliminary injunctions, there are at least five independent reasons the Court should deny the Motion:

1. <u>The Motion is riddled with falsehoods and deceptions that must not be rewarded</u>. The allegations related to alleged financial impropriety are shockingly false: the Headquarters House, company cars, and rental facilities at issue are all owned or leased *by AFLDS* and are all used for company business, with the knowing consent of Mr. Gilbert and the other directors. Mr. Gilbert himself has even used the Headquarters House and cars. *Plaintiffs knew all that but decided to not tell the Court*.

2. <u>The relief requested by the Motion would upend the status quo and harm AFLDS</u>. It should be axiomatic that, while a technical corporate control dispute is pending, courts do not upend the ongoing enterprise. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) ("In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."); *Stemple v. Board of Education of Prince George's County*, 623 F.2d 893 (4th Cir.1980) (reasoning that the status is as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing"). <u>But that is what Plaintiffs ask for anyway</u>. AFLDS's ongoing business enterprise is (and has always been) under Gold's direction. But the Motion asks the Court to upend the enterprise and hand the it to someone who has already attempted mass firings. A preliminary order destroying continuity would harm AFLDS by dismantling the ongoing enterprise.

1

3. <u>Plaintiffs put the cart before the horse—they pretend to *be* AFLDS but are not likely to remain in their positions</u>. This lawsuit was filed by Mr. Gilbert and his allies as retaliation against Gold, who was seeking accountability for Mr. Gilbert's financial misdealing. In 2021, Mr. Gilbert—an attorney—convinced AFLDS to deposit $1.1 million dollars with his law firm without disclosing a conflict of interest. This dispute only developed after (i) Gold demanded a return of the money and (ii) Gold and AFLDS Executive Director Lisa Andrzejewski confronted Mr. Gilbert about improper transfers of thousands of dollars to himself. Rather than face scrutiny, Mr. Gilbert immediately tried to fire Gold and Executive Director Lisa A Andrzejewski, and then he launched this coup attempt.[1] Gold has filed appropriate litigation in Arizona to remove Mr. Gilbert and his allies, and to resolve the leadership dispute (Maricopa County, Arizona Superior Court Case No. CV2022-015525).

4. <u>The Court lacks subject matter jurisdiction</u>. As explained in prior briefing, AFLDS's nerve center is in Naples, Florida, which destroys diversity jurisdiction. Plaintiffs seemingly concede that the nerve center *was* in Naples, Florida—before Mr. Gilbert tried to destroy the operation by firing everyone—but do not prove where it allegedly is now. Plaintiffs cannot meet *their* burden of demonstrating jurisdiction.

5. <u>Even if the Court has subject matter jurisdiction, it should abstain under the principles of *Colorado River*</u>. This matter should be in state courts, and specifically those of Arizona. This is an uncommon type of case where this Court cannot afford complete relief among the parties for several reasons: (i) it likely cannot remove Mr. Gilbert and the other malfeasant Board members; (ii) Gold prevailing would likely eliminate jurisdiction—if it is shown that she remains in control (the reality), then this Court would be divested of diversity jurisdiction, sending the dispute to state courts anyway; and (iii) Arizona nonprofit control laws predominate and should addressed by Arizona courts.

---

[1] The Court previously noted that Plaintiffs seemed to have waited a long time to seek relief—they knew about the allegedly outrageous activities they now complain about for months and months. That is because Gold's ongoing leadership and AFLDS's Naples, Florida operation and expenses were all known and approved, until a fictive narrative was needed to help Mr. Gilbert retaliate against Gold.

## II.    FACTUAL ISSUES

### A.    Formation and Purpose of AFLDS

Gold is both a medical doctor (an emergency physician) and a lawyer. She founded AFLDS as an Arizona nonprofit corporation in June 2020. [Decl. of Dr. Simone Gold ("Gold Decl."), Exhibit 1 hereto, ¶ 2]. AFLDS's mission and work includes advocating for medical and healthcare issues, combatting media censorship of medical-related information, and supporting medical freedom and civil liberties around healthcare issues. AFLDS offers an array of online content related to those issues, and more than 2,000 medical professionals are associated with AFLDS. [Gold Decl. ¶¶ 3, 7]. Since its formation, AFLDS has been successful in raising funds for its mission and work, predominantly though Gold's efforts. [Gold Decl. ¶¶ 4-5]. Gold is the "face" of AFLDS. She frequently engages in public speaking on topics related to AFLDS's mission and work. [Gold Decl. ¶¶ 8-9].

Gold manages nearly all of the AFLDS workers that participate in the ongoing enterprise. The vast majority of AFLDS's workers, who see themselves as "freedom fighters," have indicated that they remain working for AFLDS because of Gold's connection to the organization. [Gold Decl. ¶ 12].

### B.    The Board of Directors of AFLDS

In 2020, shortly after she founded AFLDS, Gold became a director, Chairman of the Board, and President of the organization. Gold remains in those roles to this day, though the issue is disputed. [Gold Decl. ¶ 13]. Plaintiff Joseph

3

"Joey" Gilbert ("Gilbert") was appointed a director of AFLDS in or about March 2021. Richard Mack ("Mack") and Jurgen Matthesius ("Matthesius") were added to the Board in or about December 2021. [Gold Decl. ¶ 14]. As of early 2022, the Board of Directors for AFLDS consisted of Gold, Gilbert, Landau, Mack, and Matthesius. [*Id.*].

### C.    The Failed Agreement for Gold to Resign from the Board

In early 2022, Gold considered the possibility of stepping down from her position on the Board of Directors, in the interest of protecting the functionality of AFLDS (including concerns that she had become a political target of third parties) and so that she could continue her extraordinary contributions to AFLDS of visionary leadership and increasing public support while simultaneously protecting other efforts, such as starting healthcare clinics. [Gold Decl. ¶ 15].

Gold's attorney, George Wentz, negotiated on her behalf with the other members of the Board of Directors to reach an agreement for Gold to leave the Board in exchange for a set of promises, including valuable consideration. In or around February 2022, Gold and the other members of the Board of Directors reached an agreement that Gold would resign from the Board of Directors in exchange for an agreement regarding an ongoing arrangement, which included the following major components: (i) Gold would have an ongoing consulting agreement with AFLDS for monthly compensation, and (ii) AFLDS would provide Gold with

a payment for seed money to start certain healthcare clinics (collectively, the "Resignation Agreement"). [Gold Decl. ¶¶ 16-17].

Under the Resignation Agreement, which was made between Gold and the other members of the Board of Directors, Gold's resignation was <u>conditioned</u> on the occurrence of the seed payment and the consulting agreement (and payments thereunder). [Gold Decl. ¶ 18].

At a meeting of the Board of Directors on or about February 2, 2022, Gold orally offered her resignation, performing her obligations under the Resignation Agreement. Gold (through counsel) and the other members of the Board of Directors negotiated and agreed that the seed money payment would be $1.5 million and that Gold's compensation for the consulting agreement would be $50,000 per month, plus residence in AFLDS-owned property. [Gold Decl. ¶ 19].

Despite these agreements, the other members of the Board of Directors (Gilbert, Mack, and Matthesius[2]) never performed. No portion of the seed payment was ever paid to Gold, and the consulting agreement was never executed. [Gold Decl. ¶¶ 20-21]. The seed payment and the consulting agreement were material terms of the Resignation Agreement. The seed payment and the consulting agreement were <u>both</u> conditions precedent to Gold's resignation taking effect. [Gold

---

[2] Landau resigned from the Board in or about March 2022, leaving only Gold, Gilbert, Mack, and Matthesius as members of the Board.

Decl. ¶ 21].

Because the seed payment and the consulting agreement (both conditions) never occurred, the Resignation Agreement never took effect.[3] Specifically, Gold's offered resignation from the Board never took effect. [Gold Decl. ¶ 22].

Additionally or in the alternative, the cash payment, consulting agreement, and consulting compensation were the other Board members' performance under the Resignation Agreement. Because a substantial part of that performance (the seed payment) never occurred, Gold was entitled to, and did, rescind the Resignation Agreement, returning the parties to the status quo before the agreement was formed — in other words, with Gold on the Board and President. [Gold Decl. ¶ 23]. As a result, Gold remained (and, as of the filing of this Response, remains) a member (and Chairman) of the AFLDS Board. [Gold Decl. ¶ 24].

This fact was confirmed by the subsequent conduct of the parties. For example, because the Resignation Agreement never took effect, Gold never gave her resignation in writing, as required by Section 7.1 of AFLDS's bylaws. [Gold Decl. ¶ 25]. And indeed, other than a brief absence during the summer of 2022, Gold has continued to principally direct the operations of AFLDS, including since February 2022, with the knowing consent of Plaintiffs. [Gold Decl. ¶ 26].

---

[3] There should be no doubt that resignations can be conditional. For example, Supreme Court justices and other federal judges sometimes condition their resignation or senior status upon the appointment of a successor.

**D.     Gilbert's Malfeasance**

In or around March 2021, Gilbert — an attorney practicing law in Nevada — convinced Gold to deposit $1.1 million in AFLDS funds into the trust account of his law firm. [Gold Decl. ¶ 27]. In doing so, Gilbert failed to disclose the existence of an unwaivable conflict of interest arising from the fact that he was being added to the Board of Directors for AFLDS that same month. [Gold Decl. ¶ 28]. Since at least January 2022, Gold has demanded that Gilbert return those funds to an AFLDS bank account. Gilbert verbally agreed multiple times to return the money, but he never did so. [Gold Decl. ¶ 29].

Instead, Gilbert saw an opportunity to remove Gold, and potentially keep the money, and hide other financial improprieties. In summer 2022, Gold spent 48 days incarcerated on a misdemeanor trespassing charge related to being at the U.S. Capitol on January 6, 2021. As Founder and President of AFLDS, Gold was an invited guest speaker, alongside members of Congress. [Gold Decl. ¶ 30].

During Gold's short absence from AFLDS, she left various AFLDS personnel with instructions about their roles and authority. The Executive Director, Lisa Andrzejewski, was left in charge of the AFLDS organization. [Gold Decl. ¶ 31]. Gilbert began to overstep his authority and to build a platform for a power grab during Gold's absence. [Gold Decl. ¶ 32]. For example, in August 2022, and despite lacking authority, Gilbert purported to fire two key AFLDS workers,

National Director Alison Rockett and Creative Director John Strand, as well as a consultant AFLDS had already hired and prepaid for six months' work. [Gold Decl. ¶ 33].

Additionally, following her release in September 2022, Gold discovered that Gilbert was engaging in malfeasance, including financial improprieties, related to AFLDS. For example, Troy Brewer, a certified public accountant whose firm has provided services to AFLDS for most of its existence, confirmed in October 2022 that Gilbert had, since May 2022, taken at least $5,000 per month (and up to $10,000 per month) in AFLDS funds and appropriated it for his personal use. [Gold Decl. ¶¶ 34-35; Declaration of Troy Brewer ("Brewer Decl."), Exhibit 2 hereto, ¶¶ 12-13; Declaration of Lisa Andrzejewski ("Andrzejewski Decl."), Exhibit 3 hereto, ¶¶ 13, 20]. Those withdrawals were completely improper. [Gold Decl. ¶ 35].

Further, during Gold's incarceration, Gilbert forced Troy Brewer to pay $12,000 per month to his personal campaign manager for his failed campaign for governor of Nevada. But she was only a part time worker who had just started, and her salary was only approved for $3,000 per month. [Gold Decl. ¶ 37; Brewer Decl. ¶ 18; Andrzejewski Decl. ¶¶ 14-21].

In October 2022, Gold reported Gilbert's malfeasance to the Board of Directors, and AFLDS outside counsel Sally Wagenmaker. No actions were taken by those parties to address the situation. [Gold Decl. ¶ 41].

### E.    Gilbert's Power Grab

As retaliation for Gold's investigations of his malfeasance, and in an attempt to cover-up, obfuscate, and avoid responsibility for his wrongdoing, Gilbert attempted to seize control of AFLDS and launched a smear campaign against Gold. [Gold Decl. ¶ 42].

Gilbert falsely announced to AFLDS employees that Gold purportedly was no longer in charge at the company. [Gold Decl. ¶ 43]. Gilbert then attempted to dismantle the company. Notwithstanding his lack of authority, Gilbert purported to fire key AFLDS employees and personnel, without cause. In October 2022, Gilbert, without cause or authority, purported to fire Executive Director Lisa Andrzejewski, shortly after she confronted him about his financial improprieties. [Gold Decl. ¶¶ 44-45; Andrzejewski Decl. ¶¶ 13, 20, 25; Brewer Decl. ¶ 14]. In late October, Gilbert purported to fire Gold. [Gold Decl. ¶ 45]. Apparently seeking capitulation to his takeover attempt, Gilbert began threatening AFLDS employees that he would cut their pay or fire them. [Gold Decl. ¶ 46].

Gilbert also fabricated allegations that Gold had acted improperly, which he spread to AFLDS employees, lawyers, and the community, including through social media. For example, Gilbert unleashed the false allegations in this lawsuit about the Headquarters House. [Gold Decl. ¶ 47-54]. But Gilbert approved the house purchase and has stayed at the Headquarters House. [*Id.*].

Gilbert's purported mass firings continued. On or about November 7, 2022, Gilbert, with no authority or cause, purported to fire Operations Director Sarah Denis, Security, Logistics, and Procurement Director AJ Andrzejewski, and Communications Director Lisa Alexander. [Gold Decl. ¶ 61]. AFLDS has a total of 11 director-level positions, in addition to the President: Executive Director, National Director, Medical Director, Communications Director, Creative Director, Security-Logistics-Procurement Director, IT Director, Operations Director, Social Media Director, Legal Director, and News Director. Gilbert purports to have fired six of those 11 directors and has threatened to fire four others. [Gold Decl. ¶ 62].

### F.     Threats and Intimidation of AFLDS's CPA

Again, Gilbert holds $1.1 million of AFLDS funds that were deposited by Gold in the trust account of his law firm, which he has refused to return to AFLDS. Gold believes that Gilbert may have inappropriately transferred some or all of those funds to his attorneys to fund this litigation. [Gold Decl. ¶ 63].

On November 21, 2022, AFLDS's CPA, Troy Brewer, requested that Gilbert return that money. [Brewer Decl. ¶ 7]. Gilbert did not do so. Instead, Gilbert, Mack, and Counsel Sally Wagenmaker began a campaign of threats against Mr. Brewer, including Mack (a former sheriff with ongoing law-enforcement connections) threatening him with arrest. The actions to threaten and coerce Mr. Brewer for doing his job have paralyzed his ability to keep AFLDS's finances operating. [Brewer

Decl. ¶¶ 7-11]. Details are provided in his declaration. [*See generally id.*].

G.    **Mack and Matthesius's Other Acts and Omissions**

It should first be noted that Mack and Matthesius are likely beyond the personal jurisdiction of this Court. But their conduct can help the Court understand why Gold must ask an Arizona court to clean up AFLDS's Board of Directors. Beyond the specific acts by Mack described above, Mack and Matthesius have otherwise supported, facilitated, and/or permitted Gilbert's wrongful acts and attempt to seize control. For example, Mack and Matthesius failed to act or investigate when notified about Gilbert's wrongdoing, or when Gilbert purported to fire the majority of AFLDS's directors. [Gold Decl. ¶¶ 68-69].

Mack has also engaged or participated in financial improprieties and/or misused AFLDS. For example, in mid-2022, Mack asked Gold to cause AFLDS to donate $2.5 million to an event Mack was organizing. Gold conveyed to Mack, that this would be inappropriate and an abuse of donor money. Mack then asked Gilbert to pressure Gold to donate the money. Even Gilbert pointed out this was an ethical conflict for Mack, at a Board meeting in or around June 2022. [Gold Decl. ¶ 70].[4]

But later, needing allies for his retaliation against Gold, Gilbert purported to hire Mack as "CEO" of AFLDS for $20,000 per month, in or around October, 2022.

---

[4] Of note, Mack's request to Gold to cause AFLDS to donate money to his organization was a recognition of Gold's continued status as a Director and head of AFLDS operations and finances.

11

[Gold Decl. ¶ 71; Brewer Decl. ¶ 19]. But AFLDS and its bylaws do not have the position of "CEO." [Gold Decl. ¶ 71].

## III.  ARGUMENT

### A.   By ignoring the ongoing AFLDS leadership dispute, Plaintiffs put the cart before the horse.

Serious allegations of wrongdoing have been leveled against Gold. They are false. The ongoing AFLDS leadership dispute, and this lawsuit, is retaliation for Gold seeking accountability from Mr. Gilbert for his serious improprieties.

Preliminarily, the Court should note the massive disconnect between the gripes of the Motion (e.g., complaining about Gold's assertion of a leadership role) versus the actual claims of the Complaint (essentially damages claims)—the Court is nowhere asked to declare who are the proper leaders of AFLDS. The Complaint simply presupposes AFLDS is a real party to this action, and that Mr. Gilbert is in control of it.

Indeed, in describing the supposed wrongs that they contend necessitate drastic preliminary relief here, Plaintiffs spend *three full pages* of the Motion alleging individual instances where Gold held herself out as a Board member and President of AFLDS. [Mot. pp. 9-11]. But Gold *is* a Board member and President, and thus *none of that alleged conduct is improper*.

Another core falsehood in the Motion is the idea that Gold is suddenly trying to seize AFLDS—that is not true. Gold has operated AFLDS *at all relevant times*;

12

the entity was even operated by the Executive Director, acting on Gold's instructions, during Gold's 48-day incarceration. Gold is simply trying beat back Mr. Gilbert's improper (and failed) attempts to seize practical control.

Rather than resolve this leadership issue in an orderly fashion with a judicial determination (e.g., by filing an Arizona action under the Arizona Nonprofit Corporation Act), Plaintiffs skipped that step and simply brought damages and defamation claims in this Court. But the logical (and necessary) prerequisite to those claims is a judicial determination of the proper leadership of AFLDS.

The threshold leadership issue needs to be decided in Arizona before damages claims are considered and decided here. For reasons discussed below, only Arizona courts have jurisdiction over all leadership issues and the necessary parties—because this Court cannot entertain derivative counterclaims and lacks jurisdiction over two board members, complete relief can only be had from state courts in Arizona (the place of formation).

### B. Plaintiffs, relying on stunningly false allegations and refusing to acknowledge the ongoing leadership dispute, fail to meet the high standard for a preliminary injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). One is only ever issued "when drastic relief is necessary to preserve the status quo." *All Care Nursing Service, Inc. v. Bethesda Memorial Hosp., Inc.*, 887 F. 2d 1535, 1537 (11th Cir.

13

1989). Critically, <u>determining what the status quo is (and whether it needs to be protected) is a practical test that judges the reality of corporate control, not solely alleged legal rights</u>. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) ("In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."); *see also Stemple v. Board of Education of Prince George's County*, 623 F.2d 893 (4th Cir.1980) (reasoning that the status quo is as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."); *Dawson v. Superior Court*, 163 Ariz. 223, 226, 786 P.2d 1074, 1077 (App. 1990) ("The 'status quo' . . . is obviously the restoration or continuation of the employee's status and treatment prior to a retaliatory employment action.").

To obtain a preliminary injunction, a party must establish all of the traditional elements: (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) balance of the hardships favors movant, and (4) issuance would not be adverse to the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

Significantly, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes a 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Here, Plaintiff cannot establish any, let alone all, of the requirements to

14

obtain a preliminary injunction. As a result, the Court should deny Plaintiff's motion.

### 1. Plaintiffs are not likely to prevail on the merits.

In the Complaint, Plaintiffs have asserted claims for fraud, conversion, tortious interference, breaches of fiduciary duty, and defamation—conspicuously missing is any claim to declare the parties' positions/offices in AFLDS.

There is a major disconnect between the merits and the preliminary relief sought. Specifically, the Motion *does not address* Gold's contentions about her continued leadership and control of AFLDS. Plaintiffs' argument is that, *assuming* that Gilbert is in control of AFLDS and entitled to bring claims (something the Court cannot assume; Plaintiffs must prove this as part of their likelihood of success), then Gilbert's claims may succeed (something barely addressed in the Motion), so an injunction should be granted now. Plaintiffs—skipping over prerequisite parts of the analysis and relying on falsehoods anyway—fall far, far short of meeting their burden on likelihood of success.

The Motion is riddled with falsehoods and deceptions that must not be rewarded. The allegations related to alleged financial impropriety (Motion pp. 4-5) focus on two houses, three vehicles, certain expenses, and travel expenses. All allegations are false or deceptively omit key information:

- Plaintiffs knew when they filed the Motion that the Headquarters House—falsely painted as some kind of fraudulent purchase—was specifically approved by the Board of Directors. [Gold Decl. ¶¶ 49, 51-53; Brewer Decl. ¶ 20; AFLDS Meeting Minutes Approving

Headquarters House Purchase, <u>Exhibit 4</u> hereto]. Mr. Gilbert has himself used and stayed at the Headquarters House when visiting Naples, Florida on AFLDS business.

- Plaintiffs knew when they filed the Motion that the Headquarters House was purchased *by AFLDS* through a wholly-owned subsidiary, Naples Freedom Headquarters, LLC, a Florida company.[5] [Gold Decl. ¶¶ 52-53; Operating Agreement (unsigned), <u>Exhibit 5</u> hereto; Declaration of George Wentz ("Wentz Decl."), <u>Exhibit 6</u> hereto, ¶¶ 7-8; Warranty Deed for Headquarters House, <u>Exhibit 7</u> hereto].

- AFLDS and Joseph Gilbert knew of and approved the house purchase through Naples Freedom Headquarters LLC. [Gold Decl. ¶¶ 49, 51]. AFLDS's general counsel arranged formation of the entity that was the purchaser. [Gold Decl. ¶ 53]. The purchaser's address on the house Deed was Joseph Gilbert's law firm address in Reno, Nevada.[6] [*Id.*].

- The three vehicles in Naples, Florida are owned by AFLDS and are used for business purposes to support the AFLDS campus there, and for AFLDS-related travel. Gold uses the sprinter van as she travels for AFLDS-related speaking engagements—logging over 50,000 miles in the time it has been owned. [Gold Decl. ¶ 55]. This was known to Plaintiffs when they filed the Motion—Mr. Gilbert himself has used the company vehicles when in Naples, Florida on AFLDS business. [*Id.*].

- The allegations about improper expenses are simply false. AFLDS has paid workers to support its Naples, Florida campus. They are not personal expenses. AJ Andrzejewski is not a personal security guard; he was hired *by AFLDS* as its Director of Security, Logistics, and Procurement. [Gold Decl. ¶¶ 56-57].

- AFLDS has incurred travel and other expenses to support Gold's speaking and fundraising trips, which are vital to the organization. AFLDS has incurred further expense to support the AFLDS campus in Naples, Florida. Each expense was proper and in furtherance of

---

[5] AFLDS is the sole member of Naples Freedom Headquarters, LLC, and this fact was puzzlingly omitted from the Complaint and the Motion. This is one example of a serious lack of candor and truthfulness throughout Plaintiffs' filings.

[6] 405 Marsh Avenue, Reno, NV 89509.

company business. [Gold Decl. ¶¶ 58-59].

Plaintiffs have not met their burden of showing likelihood of success as to <u>any</u> of the specific causes of action raised in the Motion. First, "AFLDS"[7] has essentially zero likelihood of success on its fraud claim because (i) Gold's representations about her leadership role are true, and (ii) she reasonably believes them in light of her legal claims against Gilbert. The Motion does not legally analyze the legitimacy of Gold's representations, or address her legal position about her roles at AFLDS, *at all*.

Second, "AFLDS" has essentially zero likelihood of success on its conversion claim because Gold's stewardship of AFLDS is not wrongful—it is being done under a claim of right while the leadership issue is disputed. As for the allegations that Gold used AFLDS funds to purchase the Headquarters House and vehicles, this cannot support a conversion claim because the funds were not *taken from* AFLDS— *AFLDS* purchased the assets, *AFLDS* exchanged the funds for valuable assets (which it now owns), and *AFLDS and Gilbert* both participated in and authorized the purchases.[8] In any case, this claim can be completely resolved by money damages.

Third, Plaintiff has a very limited likelihood of success on its breach of

---

[7] Again, Gold disputes that AFLDS is properly a plaintiff here; Gilbert lacks the authority to bring claims *as AFLDS*.

[8] Indeed, even if there were a legal claim, Plaintiffs would likely be barred from bringing it because they are *in pari delicto*—AFLDS and Gilbert participated in and authorized the real estate and vehicle purchases. *See, e.g.*, *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006).

fiduciary duty and tortious interference claims because Gold's stewardship of AFLDS and her interactions with AFLDS business affiliates is not wrongful—it is being done under a claim of right while the leadership issue is disputed. Again, Plaintiffs omit any analysis of the likelihood of success on *that underlying issue*. And, in any case, these claims can be completely resolved by money damages.

Fourth, Gilbert's defamation claim should not have been included in the Motion. Federal courts rarely issue prior restraints on speech. *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ("Any prior restraint on expression comes to this Court with a heavy presumption against its constitutional validity.").[9] Most of the alleged defamation is simply Gold expressing her position on the AFLDS leadership dispute anyway. Regardless, Gold's alleged defamation is believed by her to be true, is true to the best of her knowledge, and could be resolved by money damages. It is completely unfit for preliminary relief.

Plaintiffs—with their deficient analysis that relies on factual falsehoods, *presumes without any analysis* that Gold is no longer in her leadership roles, ignores Gold's legitimate legal positions and defenses, barely even addresses Plaintiffs' own

---

[9] This Court is not likely to be tempted by a prior restraint on allegedly defamatory speech, but it is important to emphasize that the rule is deeply ingrained in American law. *See, e.g.*, Right of Publicity and Privacy § 11:24 (2d ed.) ("One well-known aspect of the prior restraint doctrine is embodied in the rule that equity will not enjoin the impending publication of matter allegedly defamatory of the personal reputation of plaintiff. This is embodied in the maxim that 'Equity will not enjoin a libel.'").

legal claims, and substantially fails to tie those actual legal claims to the broad injunctive relief they seek or the harms they allege—have not come anywhere close to meeting their burden of showing likelihood of success on the merits. This is an independent reason that the Motion should be denied.

### 2. Plaintiffs will not suffer irreparable harm if the injunction is not issued; AFLDS will only be harmed *if* it is issued.

Even if Plaintiffs could demonstrate a likelihood of success (which, thus far, they have not), "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Demonstrating irreparable harm "is the *sine qua non* of injunctive relief." *Jernard v. Comm'r, Georgia Detp. of Corrections*, 457 F. App'x. 837, 839 (11th Cir. 2012). Plaintiffs must prove an irreparable harm that is "neither remote or speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176.

First, Plaintiffs have not proven actual harm. It is not sufficient for a plaintiff to merely show economic harm; "the key word in this consideration is irreparable." *Baker v. School Bd. Of Marion County, Fla.*, 487 F. Supp. 380, 384 (M.D. Fla. 1980). A plaintiff may potentially recover monetary or corrective relief at a later date, which means such harm is not irreparable. *Id.* Additionally, a plaintiff may not assert future, theoretical harm. *Ray v. School Dist. of Desoto County*, 666 F. Supp. 1524, 1535 (M.D. Fla. 1987). Plaintiffs have not proven the harm required.

Second, the relief requested by the Motion would create harm by upending

<u>the status quo and damaging AFLDS as an ongoing concern</u>. It should be axiomatic that, while a technical corporate control dispute is pending, courts do not upend the ongoing enterprise. *See Sovereign Order of Saint John of Jerusalem-Knights of Malta v. Messineo*, 572 F. Supp. 983, 988 (D.C. Pa. 1983) (denying a preliminary injunction because "the plaintiff seeks to alter the status quo . . . an order enjoining the defendants from carrying on the business of the corporation, an activity they have been collectively carrying on since 1980").[10]

Gold has been operating AFLDS since its inception. She did <u>not</u> suddenly try to take over the entity, as the Motion contends. Even during her 48-day incarceration, the Executive Director of AFLDS acted at Gold's direction. What actually happened was that Gold discovered Mr. Gilbert's financial improprieties, and thereafter resisted *his* failed takeover attempt, and is now subject to this retaliation.

Granting the Plaintiffs' requests would *disrupt* the status quo and harm AFLDS.[11] AFLDS's ongoing business enterprise has dozens of workers acting at Gold's direction, and it continues to operate just fine—the house is in order and

---

[10] *Messineo* is analogous to the dispute here. 572 F. Supp. at 984 ("This action involves a complex dispute among many parties over the control of a non-profit. . . . Plaintiff seeks to enjoin the defendants from continuing to represent themselves as directors or members of the corporation, from using the corporation's registered marks, from soliciting or accepting contributions on behalf of the corporation and order, and from carrying on corporate business in any way.").

[11] The Court is faced with the oddity that Defendant Gold is trying to protect AFLDS, a purported plaintiff, from being torn apart by a malfeasant director (Gilbert).

functioning. Gilbert has purported to fire six AFLDS directors and threatened to fire four more—that is 10 of 11. He now asks the Court to endorse this corporate arson, on a preliminary basis, and help him shred AFLDS as an ongoing concern.

The practical reality—the status quo—is that Gold has been the top decision-maker, media "talent," and operator of AFLDS since its inception; she is the signatory on all financial accounts (and has been at all relevant times); and AFLDS workers follow her leadership. A preliminary order destroying this continuity would harm AFLDS by dismantling the ongoing enterprise.

Plaintiffs simply fail to deal with this reality—they hide behind a fictive narrative. But inconvenient facts cannot be wished away.

Plaintiffs' delay—they waited months and months to seek this relief—demonstrates the lack of imminent harm. "A delay in seeking a preliminary injunction of even only a few months —though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Powers v. Sec'y, Fla. Dep't of Corrections*, 691 F. App'x. 581, 583 (11th Cir. 2017). "[T]he very idea of a preliminary injunction is premised on the need for speedy and urgent action . . . ." *Wreal*, 840 F.3d at 1248.

Plaintiffs' sudden rush to seek relief in November—precipitated by Gold's recent discovery of Gilbert's wrongdoing and his wish to distract from it—is not urgent enough for the Court to impose such a "drastic" remedy.

### 3. The balance of the hardships weighs against the injunction sought by Plaintiffs.

Plaintiffs must also establish that the injury of failing to impose their requested injunction outweighs the harms that would be caused by entering the injunction. *Dunkin' Donuts Franchised Restaurants LLC v. D&D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1361 (M.D. Fla. 2008); *GPS Industries, LLC v. Lewis*, 691 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010) (declining to enter injunction that would inhibit the defendant from globally participating in an industry, which outweighed the plaintiff's potential harm of being unable to restrict competition).

Here, the balance of the hardships weighs strongly *against* entering Plaintiffs' proposed injunction. The narrative of harms alleged in the Motion is false.

In support of this factor of the analysis, Plaintiffs assert that irreparable harm will result if Gold is not enjoined because (they allege), she is continuing to operate AFLDS, "employees are leaving," and donors are being inhibited. Yes, Gold is continuing to operate AFLDS—*as she always has done*—but that is in the organization's best interests. AFLDS has flourished under Gold's stewardship [Gold Decl. ¶¶ 2-12]; Plaintiffs have not shown otherwise.[12]

The other allegations of "harm" are factually misleading and false. Gilbert and

---

[12] Section III.B.2, above, discusses the status quo—AFLDS is currently operating fine as an ongoing concern. The proposed injunction would *cause* the harm that needs to be avoided: damage to the entity.

his cohorts, not Gold, are the ones attempting to drive employees away—Gilbert is attempting to fire most AFLDS directors and workers. Gold is the one ensuring that the organization keeps operating, notwithstanding the purported firings. [*See generally* Gold Decl.; Andrzejewski Decl. ¶ 27]. As for the donors, they only come to AFLDS in the first place because of Gold. Gold personally generated approximately 95% of donations to AFLDS. [Gold Decl. ¶ 5]. Harm to AFLDS will result if she is *prevented* from communicating with donors, not the other way around.

In short, Plaintiffs will suffer no irreparable harm of any consequence if their injunction is denied. In contrast, if the injunction is entered, Gold *and AFLDS* will suffer serious, irreparable harm. This factor strongly weighs against an injunction.

### 4.  Issuing the injunction would be adverse the public interest.

Lastly, the public interest prong focuses on the effect on third parties. *Florida Atlantic University Bd. of Trustees v. Parsont*, 645 F. Supp. 3d 1279, 1299 (S.D. Fla. 2020) (quotation marks omitted). Here, granting the injunction will harm donors and the public by derailing AFLDS and its non-profit mission. Though not predominant in the analysis, this factor, too, weighs against an injunction.

### C.  Independently, the Motion should also be denied because this Court lacks subject matter jurisdiction.

As discussed in Gold's Motion to Dismiss (Doc. 24), this Court lacks subject matter jurisdiction. The arguments of the Motion to Dismiss are incorporated herein by reference. Plaintiffs have not, either in the Motion or in response to the Motion

to Dismiss or anywhere else in the record, proved *where* AFLDS's nerve center is located (and, thus, where it is a citizen). They seem to concede it *was* in Naples, Florida, but argue that that was somehow diminished when Gilbert attempted his mass firings. As a result, Plaintiffs have failed to prove diversity jurisdiction.

### D.   In the alternative, the Motion should also be denied because the Court should abstain under the *Colorado River* principles.

This action should have been brought in the courts of Arizona under the Arizona Nonprofit Corporation Act, where Gold's action is now pending.[13] Thus, if the Court determines it has jurisdiction, it should stay the matter under the principles of *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813 (1976). Most important, the cases overlap significantly but the leadership control claims in Arizona must be sorted our first.[14] Additionally, this is an uncommon type of case where this Court cannot afford complete relief among the parties. First, an action by Gold to remove other members of the Board of Directors must be brought derivatively. *See* Ariz. Rev. Stat. § 10-3631, *et seq*. Such derivative claims—brought on behalf of AFLDS—cannot be asserted as a counterclaim in this Court because (i) they are not personal to Gold and (ii) such claims would destroy diversity (if it existed).

---

[13] Gold's Arizona litigation brings claims to remove Gilbert, Mack, and Matthesius and declare her rights. [Verif. Compl., Arizona action, <u>Exhibit 8</u> hereto].

[14] AFLDS is not a real plaintiff to this action, and the Arizona case will decide that.

Second, the Court is faced with the oddity that Gold likely cannot meaningfully prevail in this Court—if it is shown that she remains in (the reality) or should be in control, then there could be no question (if there ever was) that AFLDS's nerve center remains in Florida, and this Court would be divested of diversity jurisdiction (if it existed), sending the dispute to state courts anyway. Lack of jurisdiction cannot be waived, and jurisdiction cannot be conferred upon a federal court by consent, inaction, or stipulation—once a federal court determines that it is without subject matter jurisdiction, it is incumbent upon the court to dismiss the case. *Univ. of South Ala. v. American Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Accordingly, this case uniquely presents a risk of a waste of judicial and party resources compared to the pending Arizona litigation.

Third, Arizona courts are better suited to hear this dispute. This is intended as no slight on the Court, but Arizona nonprofit control laws predominate and should addressed by Arizona courts, who have expertise in this area, especially after the proliferation of litigation after Arizona's nonprofit medical marijuana boom.

This argument is presented as an additional, independent reason to deny the Motion. If the Court determines that it has jurisdiction, Gold will bring an appropriate *Colorado River* motion to stay.

## IV.    Conclusion

For each of these reasons, the Motion should be denied in its entirety.

Dated: December 2, 2022

Respectfully submitted,

*/s/ Angelina M. Gonzalez*
Angelina M. Gonzalez, Esq.
Florida Bar No. 98063
**DICKINSON WRIGHT PLLC**
350 East Las Olas Blvd., Suite 1750
Fort Lauderdale, FL 33301
Tel: (954) 303-9233
Fax: (844) 670-6009
Email: agonzalez@dickinson-wright.com

Bradley A. Burns, Esq.
Arizona Bar No. 030508 (admitted *pro hac vice*)
Amanda E. Newman, Esq.
Arizona Bar No. 032462 (admitted *pro hac vice*)
**DICKINSON WRIGHT PLLC**
1850 N. Central Ave., Suite 1400
Tel: (602) 285-5000
Fax: (844) 670-6009
Email: bburns@dickinsonwright.com
Email: anewman@dickinsonwright.com
*Attorneys for Defendant Dr. Simone Gold*

26

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing *Motion to Dismiss* was served using CM/ECF system on December 2, 2022, on all counsel or parties of record on the service list below.

## **SERVICE LIST**

Joshua D. Lerner
Florida Bar No. 455067
E-mail: jlerner@rumberger.com
Email: docketingmiami@rumberger.com
Email: jlernersecy@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
Brickell City Tower, Suite 3000 80 S.W. 8th Street
Miami, Florida 33130
Telephone: (305) 358-5577
Telecopier: (305) 371-7580

Samantha D. Duke
Florida Bar No. 091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801) Post Office Box 1873
Orlando, Florida 32802-1873
Telephone: (407) 872-7300
Telecopier: (407) 841-2133
*Attorneys for Plaintiffs*

/s/ Angelina M. Gonzalez
Angelina M. Gonzalez, Esq.
Florida Bar No. 98063

27